**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ellis E. NEDER, Jr., Defendant–Appellant.**

**No. 92–2929.**

United States Court of Appeals, Eleventh Circuit.

Dec. 10, 1999.

**1124**

Thomas Benjamin Nachbar, Mayer, Brown & Platt, Chicago, IL, Noel G. Lawrence, Noel G. Lawrence, P.A., Jacksonville, FL, for Defendant–Appellant.

Tamra Phipps, Tampa, FL, Charles Lee Truncale, Jacksonville, FL, for Plaintiff–Appellee.

Before TJOFLAT and HULL, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

HULL, Circuit Judge:

## ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

This case is before us on remand from the Supreme Court, for us to consider in the first instance whether the district court's failure to instruct the jury on materiality as an element of the federal mail fraud, wire fraud, and bank fraud statutes, 18 U.S.C. §§ 1341, 1343, and 1344, respectively, was harmless error.[1] *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999), *aff'g in part and rev'g in part,* 136 F.3d 1459 (1998). After review, we conclude that the failure to instruct on materiality was harmless error. Accordingly, we affirm Appellant Ellis E. Neder, Jr.'s convictions for mail fraud, wire fraud, and bank fraud.

## I. BACKGROUND

Neder, who had been an attorney and real estate developer, was convicted of, *inter alia,* twelve counts of bank fraud (Counts 2–12, 77), nine counts of mail fraud (Counts 21–23, 26–28, 30, 34, 35), and ten counts of wire fraud (Counts 31–33, 78–84).[2] These bank fraud, mail fraud, and wire fraud charges arose from Neder's actions in obtaining land acquisition and development loans between 1984 and 1988. We first set forth the facts pertaining to Neder's land acquisition loans and development loans and then summarize the procedural history relevant to the issue on remand.

### A. Facts

#### 1. Land Acquisition Loans (Counts 2–12, 21–23, 26–28, 30, 31–33)

Neder obtained twelve land acquisition loans, each of which was for an amount

---

**1.** In his supplemental briefs on remand, Neder renews his challenge to his convictions on Counts 36 to 72 for making false statements on loan applications in violation of 18 U.S.C. § 1014. Neder concedes that materiality is not an element of § 1014, but argues that the jury's falsity determination for these counts was in error. Neder did not raise this challenge to the jury's falsity determination before the Supreme Court, and the Supreme Court remanded this case for us to consider only the materiality, and not the falsity, of Neder's statements. *See Neder,* 527 U.S. at ——, 119 S.Ct. at 1841.

**2.** In all, Neder was convicted of seventy-three counts. In addition to the bank fraud, mail fraud, and wire fraud counts, Neder was convicted of one count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371 (Count 1); thirty-seven counts of making false statements in connection with loan applications, in violation of 18 U.S.C. § 1014 (Counts 36–72); two counts of tax fraud, in violation of 26 U.S.C. § 7206(1) (Counts 86–87); and two RICO counts under 18 U.S.C. § 1962 (Counts 89–90). Neder was acquitted of eight counts charging overvaluation of land in connection with loan applications, in violation of 18 U.S.C. § 1014 (Counts 13–20).

greater than the purchase price Neder actually paid for the land involved. For each loan, Neder represented to the lenders that he, through a limited partnership he controlled, had contracted to purchase land from a corporation at a certain price. From the contracts, the sales between the limited partnerships and corporations appeared to be arms' length transactions. The purchase contracts indicated that Neder's limited partnerships had made substantial down payments, totaling more than $3,587,000. Neder also submitted appraisals indicating that the purchase price his limited partnerships had agreed to pay was equal to or less than the fair market value of the land. In each case, the lenders agreed to loan Neder seventy to seventy-five percent of the purchase price which his limited partnership had agreed to pay the seller-corporation.

However, these purchases were actually part of Neder's "land-flip" scheme. Neder controlled both the seller-corporation and the buyer-limited partnership. Neder used his corporations as nominees or intermediaries to buy property from third-party land owners at one price (the "initial price"). His nominee corporation simultaneously resold that same land to his partnership at a substantially higher price (or the "inflated price"). The loan amounts, based on the higher, inflated prices, actually exceeded the total initial prices. Thus, from the loan proceeds, Neder was able to pay the entire initial sales prices to the third-party sellers and still have a total of over $7 million left over from these loans.

In each "land flip," a check was issued to Neder's corporation for the difference between the amount of the loan to his partnership and the initial price paid to the original, third-party seller. Even though payable to his corporation, Neder endorsed the checks, payable to himself, and deposited them in his personal account.

In this way, Neder fraudulently obtained more than $7 million from these loans.[3]

Neder concealed from the lenders that he was taking these loan proceeds. Neder also concealed his interest in the corporations by having someone, such as his friend Horace Marsh, sign documents as the corporation's president. For two loans, Neder also submitted written affidavits falsely stating that he had no relationship to the seller-corporations and that he was not sharing in the profits the corporations would receive from the land sales.

In addition, Neder had not paid the down payments as indicated in the purchase contracts. Neder claimed that he would bring checks for the amount of the down payment to closing, but those checks would not be cashed. The down payment would simply be "netted out" at closing.

The loan officers for these loans all claimed that they would not have made these loans—or, at least, would not have made them on the same terms and conditions—had they known the truth. For instance, the loan officers each indicated that the down payment representations in the land sale contracts were crucial to their lending decisions and that they would not have made loans based on the inflated prices in the land sale contracts between Neder's partnerships and corporations if they had known Neder's corporation actually bought the property at a lower initial price.

### 2. Development Loans
#### a. Cedar Creek and Southern Grove (Counts 34–35)

Neder also was charged with different types of land development fraud. The first scheme involved his Cedar Creek and Southern Grove projects. In 1985, Neder negotiated a $4,150,000 construction loan from Amerifirst Federal Savings and Loan ("Amerifirst") to build condominiums at

---

**3.** Neder paid only $75,000 of the total $17,-000,000 in principal he borrowed and eventually defaulted on all of the loans.

Cedar Creek and a $5,400,000 construction loan from Security First Federal Savings and Loan ("Security") to build condominiums at Southern Grove. Each lender required Neder to establish the marketability of his development before the lender would approve the loan and release funds for construction.

For the Cedar Creek loan, this meant Neder was required to prove that he had presold twenty condominium units, that the presale contracts were "bona fide," and that down payments had been placed in escrow as earnest money for those contracts. Neder submitted thirteen legitimate contracts. However, for the last seven required contracts, Neder submitted fraudulent sales contracts. Neder offered to make the $4,000 to $8,900 down payments, if an individual would simply sign a contract to purchase one of the units. The contracts did not reveal that Neder furnished the down payment, nor did Neder disclose to Amerifirst that he had made these payments. After obtaining the loans, Neder also had his escrow agent return the deposits he had placed for those seven contracts. Neder ultimately defaulted on this loan. The Amerifirst loan officer testified that if she had known that Neder made those last seven down payments, she would not have approved the loan or released funds to Neder for construction.

Similarly, before approving Neder's loan and releasing funds, Security required Neder to submit twenty-five reservation agreements, each signed by a prospective buyer of a condominium unit. The prospective buyers were required to pay a $500 deposit into an escrow account. To meet these requirements, Neder again solicited people to sign reservation agreements as prospective buyers, offering to pay the $500 deposits for them. Indeed, Neder paid the $500 deposits on nineteen of the twenty-five reservation agreements he submitted to Security. These reservation agreements did not reveal that Neder, rather than the prospective buyer, had

paid the $500 deposit, and again, Neder did not disclose this fact to the lender. Neder also forged the buyers' signatures on two reservation agreements. Neder received funding for the first phase of construction at Southern Grove. However, the loan officer indicated that she would not have approved this loan if she had known about Neder's making the required deposits and forging signatures.

For the next phase of construction at Southern Grove, the lender required Neder to prove that he had presold seventy percent of the units for each building before releasing construction funds for that building. Neder also had to show that the purchasers of those units had made a non-refundable down payment of ten percent of the purchase price and would qualify for a mortgage loan from Security.

To meet these presale requirements, Neder again solicited individuals to sign contracts to purchase condominiums and lend their creditworthiness to support a mortgage. In return, Neder offered to pay the $7,990 to $8,390 required for the ten percent, non-refundable down payment. Neder referred to this arrangement as "equity sharing." Neder obtained ten signed contracts in this way. Again, these contracts did not reveal that Neder furnished the down payments, nor did Neder disclose to Security that he had made the down payments. Indeed, Neder made special arrangements so it would appear that the down payment money actually came from these purchasers. Neder gave each purchaser a check for enough money to open a bank account in his or her name and then obtain a cashier's check from the money in that account to use for the down payment. The cashier's checks were delivered to Neder's escrow agent, who then verified to Security that he had received the down payments and was holding the checks. Neder's escrow agent eventually returned these cashier's checks to Neder. Neder also defaulted on this loan. Security's loan officer testified that if she had known that Neder made these

down payments, she would not have approved the release of funds for the second phase of construction.

### b. Reddie Point (Counts 78–84)

The second fraudulent scheme involved Neder's false invoices supporting the construction draw requests for his Reddie Point development project. Neder obtained a consolidated, $14 million, acquisition and development loan for this project from the United Brotherhood of Carpenters and Joiners of America (the "Union"). The terms of the loan agreement required Neder to submit draw requests for reimbursement of amounts expended on construction work actually performed at Reddie Point. Advances for future work were not permitted.

From September 1987 through March 1988, Neder submitted seven construction draw requests. Each draw request was based in large part on invoices falsely representing that certain work had been completed at Reddie Point. In reality, Neder had not paid for this work, or the work was not actually performed at Reddie Point. Furthermore, Neder submitted some invoices with more than one draw request. Based on the draw requests, the Union wired Neder over $5 million. Among other things, Neder used these funds to make loan payments for and pay for the development of his other projects. Of the $5 million Neder received, only about $1,650,000 actually related to work done at Reddie Point. Neder admits that he submitted the false invoices but claims that the Union authorized him to do so. Paul Adler and Stanley Burns, who negotiated with Neder and administered this loan for the Union, denied authorizing Neder to submit false invoices.

### c. The View (Count 77)

The last scheme involved Neder's misrepresentations about the amount of debt to be refinanced as part of a $4.7 million development loan he sought from Central Bank of the South ("Central Bank") for a project named "The View." In December 1987, Neder met with Central Bank's loan officer about this loan. The only mortgage on The View property at that time was a $847,500 land acquisition loan from Carteret Federal Savings and Loan.

Subsequently, Neder had his attorney prepare a promissory note and mortgage deed purporting to create a $280,000 second mortgage on The View. On January 21, 1988, Neder signed the deed and promissory note as mortgagor, and the documents were recorded by an attorney from Neder's law firm. This second mortgage was in favor of a trust; however, the person named as the trustee testified that he had never entered a trust agreement with Neder and knew nothing about either the mortgage deed or the $280,000 promissory note.

In February 1988, Neder's application for the $4.7 million loan was approved by Central Bank, which sent a commitment letter to Neder. In March 1988, Neder signed the commitment letter and returned it, along with a letter conditioning his acceptance on receiving a total of $1,130,000 to pay off the existing $847,500 mortgage, as well as the purported $280,000 mortgage. Central Bank's loan officer agreed to Neder's condition. However, the loan never actually closed. Central Bank required Neder's attorney to sign an opinion letter certifying that there had been no material, adverse change in Neder's financial condition, and Neder's attorney refused to do so. Because Neder took no further steps to close the loan, Central Bank treated the loan application as abandoned.

### B. Procedural History

At Neder's trial, the district court decided as a matter of law that the evidence established beyond a reasonable doubt the materiality of Neder's false or fraudulent representations for purposes of the bank, mail, wire, and tax fraud charges. Accordingly, over Neder's objection, the court

instructed the jury that it need not consider the element of materiality for these charges.

After he was convicted of these offenses, Neder appealed, arguing, *inter alia*, that the district court erred in refusing to submit the issue of materiality to the jury. In our decision, we affirmed Neder's convictions, concluding that the district court had not erred in failing to submit the issue of materiality to the jury on these counts because materiality is not mentioned in the applicable statutes and thus is not an element under the federal bank fraud, mail fraud, and wire fraud statutes. *United States v. Neder*, 136 F.3d 1459, 1462–64 (11th Cir.1998). Regarding Neder's tax fraud convictions, we concluded that materiality is an element of the offense, but the district court's failure to submit this issue to the jury was harmless error. *Id.* at 1464–65.

The Supreme Court affirmed this Court's decision in part, holding that the district court's failure to instruct the jury on materiality was harmless error with respect to the tax charges in Counts 86 and 87. *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 1839, 144 L.Ed.2d 35 (1999). However, with respect to the bank fraud, mail fraud, and wire fraud charges, the Supreme Court decided that materiality is an element of those offenses, and the district court's failure to instruct the jury on the element of materiality for purposes of those charges should be reviewed under the harmless-error standard. *Id.* at 1839–41.

■■■ The Supreme Court remanded for this Court to consider in the first instance whether the district court's failure to instruct on materiality was harmless error. *Id.* at 1841. To determine whether the removal of an element from the jury's consideration is harmless error, this Court is to consider "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* at 1839. If it is clear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," then the error is harmless. *Id.* at 1837 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

## II. DISCUSSION

■■■ As the Supreme Court has instructed, "[i]n general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder*, 527 U.S. at ——, 119 S.Ct. at 1837 (quoting *United States v. Gaudin*, 515 U.S. 506, 509, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988))); *see also United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir.1999) (using this definition to determine the materiality of a false statement in a bank fraud case). Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement. *See Gregg*, 179 F.3d at 1315.

■■■ Indeed, a false statement can be material even if the decision maker actually knew or should have known that the statement was false. *See United States v. Johnson*, 139 F.3d 1359, 1364 (11th Cir. 1998) (stating that actual knowledge "is not a defense to the 'materiality' requirement" in the context of discussing whether a false statement is material under 18 U.S.C. § 1001), *cert. denied,*—— U.S. ——, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999); *United States v. Johnson*, 530 F.2d 52, 55 (5th Cir.1976)[4] ("The natural and probable tendency of the affidavit to influence the decision to be made must be judged by the

---

**4.** This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

content of the document itself and not by any special knowledge possessed or acquired by the [Internal Revenue] Service.").[5]

■ Before examining whether there was any evidence that could lead a rational jury to conclude that Neder's falsehoods were not material to the lenders, we also address at the outset Neder's general contentions regarding the Government's burden of proof here. Neder claims the Supreme Court held that the failure to instruct on materiality can never be harmless error unless the Government shows both that Neder never contested materiality and that the evidence overwhelmingly supports the materiality of every charged falsehood. However, the Supreme Court did not hold that omission of an element can never be harmless error unless uncontested.[6] Indeed, the Supreme Court emphasized that the correct focus of harmless-error analysis is: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder*, 527 U.S. at ——, 119 S.Ct. at 1838. Stated another way, the focus is whether "the jury verdict would have been the same absent the error" or "whether the record contains evidence that could rationally lead to a contrary finding with respect to

[materiality]." *Neder*, 527 U.S. at ——, 119 S.Ct. at 1837, 1839. Thus, whether Neder contested materiality may be considered but is not the pivotal concern. Instead, what the evidence showed regarding materiality is the touchstone. Indeed, as outlined in the following, more specific discussion relating to the counts at issue, the Government's evidence of materiality for each of these bank, mail, and wire fraud counts is overwhelming.

■ Under harmless-error analysis, the Government also is not required to prove that the evidence overwhelmingly supports the materiality of *every* falsehood alleged for each mail, wire, or bank fraud count. *See United States v. Toney*, 598 F.2d 1349, 1355–56 (5th Cir.1979) ("In mail fraud cases the government need not prove every allegation of fraudulent activities appearing in the indictment. It need only prove a sufficient number of fraudulent activities to support a jury inference that there was a fraudulent scheme."). Instead, the Government must show that the evidence of materiality is so overwhelming for enough of the falsehoods charged in a particular count that no rational jury, properly instructed on the element of materiality, could have acquitted Neder on that count.[7]

---

**5.** *See also United States v. Rogers,* 118 F.3d 466, 472 (6th Cir.1997) ("The statement need not actually influence the agency, but it must have the capacity to do so.... 'A false statement can be material even if the agent to whom it is made knows that it is false.'" (quoting *United States v. LeMaster,* 54 F.3d 1224, 1230–31 (6th Cir.1995))); *United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir.1988) ("The issue is whether the statements, viewed alone, were capable of influencing the function of the FDIC. It is irrelevant what the agent who heard the statement knew at the time the statement was made.").

**6.** The language from the Supreme Court's opinion that Neder cites to support his argument on this point is taken out of context. The Supreme Court concluded that the materiality of Neder's false statements for purposes of the tax fraud counts was supported by evidence "so overwhelming, in fact, that Neder did not argue to the jury—and does not

argue here—that his false statements of income could be found immaterial." *Neder,* 527 U.S. at ——, 119 S.Ct. at 1837. The Supreme Court went on to state, "[i]n this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Id.* Considered in context, the Supreme Court's statement clearly does not mean that omission of an element of an offense can never be harmless error unless uncontested. The statement means only that the fact materiality was not contested supports the conclusion that the jury's verdict would have been the same absent the error.

**7.** To support his argument that his conviction should be reversed if just one of the falsehoods alleged to support a count could have

Additionally, we observe that the jury-instruction error did not "vitiat[e] all the jury's findings," even though it did "prevent the jury from making a finding on the element of materiality." *Neder*, 527 U.S. at ——, 119 S.Ct. at 1834. Thus, in our harmless error analysis, we accept that the jury found that Neder's representations were falsehoods, and our inquiry on remand is only whether those falsehoods were material. With this background in mind, we now consider the evidence of materiality relating specifically to the land-acquisition-loan fraud counts and then to the development-loan fraud counts.

*A. Land Acquisition Loans*

In Counts 2 through 12, 21 through 23, 26 through 28, and 30 through 33, Neder was charged with defrauding lenders in obtaining land acquisition loans by (1) submitting inflated appraisals; (2) submitting sales contracts between his nominee corporations and limited partnerships that falsely stated that down payments had been made to the corporations; (3) concealing that the land was being purchased from the original landowners at prices lower than the inflated prices being paid by the limited partnerships; (4) misrepresenting or failing to disclose the nature of his interest in the nominee corporations; and (5) failing to disclose that he was depositing in his personal account the excess loan proceeds his corporations received from the sales to his limited partnerships.

Neder's main argument that these representations were not material is that the lenders either knew or should have inquired about what Neder was doing but did not care that Neder was using the corporations as nominees in a "land-flipping" transaction, "netting" the down payment, and depositing the excess loan proceeds in his personal account. Neder introduced evidence that these practices were common in the 1980s and argued that the lenders had a duty to inquire about whether Neder was engaging in them. Neder also claims that these falsehoods were not material because he personally guaranteed the loans and, as a result, the lenders were fully secured. However, Neder's arguments are really about what the lenders knew or should have known and whether the lenders reasonably relied on Neder's representations—not whether Neder's representations were material.

Indeed, the evidence overwhelmingly establishes that Neder's representations about his appraisals, purchase prices, down payments, control over the nominee corporation, and receipt of the corporation's excess loan proceeds were material, whether considered individually or collectively, because they tended to influence or were capable of influencing the lenders' decisions. The Government elicited testimony from all of the lenders that if they had known the truth, they would not have ap-

been found not material, Neder relies primarily on *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) and *United States v. Shotts*, 145 F.3d 1289 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1111, 143 L.Ed.2d 108 (1999). However, these cases do not involve harmless-error analysis; they involve the principle that "[a] general verdict which may rest upon an insufficient legal theory must be reversed." *Shotts*, 145 F.3d at 1293 n. 3 (citing *Griffin*, 502 U.S. at 57, 112 S.Ct. at 473). From this principle, Neder incorrectly assumes that if a jury rationally could have found that one of the falsehoods alleged for a particular count was not material, that would necessarily mean Neder's conviction was based on a "legally insufficient theory." In making this as-

sumption, Neder stretches the meaning of "legally insufficient theory" and overlooks that, if no jury rationally could conclude that his other falsehoods were not material, his conviction actually would be based on a "legally sufficient theory," despite the one, immaterial falsehood. As the discussion in the text above indicates, harmless-error analysis requires us to focus on whether a jury rationally could have reached a different verdict if properly instructed, not on the materiality of each falsehood alleged in the indictment. To the extent Neder is continuing to challenge the application of harmless-error analysis to his bank, mail, and wire fraud convictions, we remind Neder that the Supreme Court already has resolved that issue. *See Neder*, 527 U.S. at ——, 119 S.Ct. at 1841.

proved Neder's land acquisition loans on the same terms and conditions, if at all. Each of these representations related to the core requirements for a land-acquisition loan. In particular, the lenders testified that the representations about prices and down payments were crucial to their decisions about approving the loans and about how much money to lend.

Regarding the appraisals, Neder points out that he was acquitted on Counts 13 to 20, which charged him with making false statements, in violation of 18 U.S.C. § 1014, for submitting these appraisals to the lenders. Neder argues that the jury must have found that the appraisals were not false and that, based on this finding, the jury might also have concluded that the appraisals were not material, if given the opportunity. However, Neder does not contend that the appraisals did not tend to influence or were not capable of influencing the lenders' decisions; Neder's challenge is directed at whether the element of falsity—and not materiality—was satisfied with regard to the appraisals. Neder's challenge to the jury's determination that the element of falsity was satisfied for purposes of the bank, mail, and wire fraud counts was not raised before the Supreme Court, and the Supreme Court remanded this case for us to consider only the materiality of Neder's falsehoods. *See Neder,* —— U.S. at ——, 119 S.Ct. at 1841. Thus, the jury's verdict having determined falsity, we are limited to deciding only whether Neder's false appraisals were material. Because, as already discussed, there was overwhelming evidence that these appraisals tended to influence and were capable of influencing the lenders' decisions, a rational jury could not have concluded that the appraisals were not material.

Count 32 also merits special discussion. For Count 32, the Government introduced evidence that the lender, Greyhound, had required Neder to verify the source of the $1,020,900 down payment he supposedly had paid. In response to this request for verification, Neder had submitted an affidavit to Greyhound, falsely swearing that the source of the deposit was a trust for the benefit of his children. At trial, Neder offered evidence that after he submitted the affidavit, the loan was restructured and became a collateral loan, based solely on the value of the land. Consequently, the representations about Neder's down payment were no longer a basis for the loan. In his closing argument, Neder argued that after this change, the representations in the affidavit were "meaningless" to Greyhound.

From this evidence that the loan became a collateral loan, a jury rationally could have concluded that Neder's representations about making the down payment were not material to Greyhound. However, this does not mean Neder's conviction on Count 32 must be reversed. Neder's representations about the down payment were only one aspect of the scheme relating to the Greyhound loan, and as discussed previously, the Government is not required to prove the materiality of every allegation of fraudulent activities appearing in an indictment for a fraud conviction. *See United States v. Toney,* 598 F.2d 1349, 1355–56 (5th Cir.1979).

In Count 32, Neder also was charged with making false representations about his purchase price, control over the nominee corporation, and receipt of the excess loan proceeds. The evidence relating to the materiality of each of these representations was so overwhelming that no jury rationally could have found that the representations were not a material matter. The Government introduced evidence that Greyhound was influenced in its decision to make a collateral loan by Neder's representations about the purchase price. If Greyhound had known that Neder controlled both the seller-corporation and buyer-partnership, and that the actual, initial purchase price paid by Neder's corporation was so much less than the inflated price, the evidence indicates that Greyhound would not have agreed to make a

collateral loan, or at least would not have lent Neder as much money as it did. Neder would have received only seventy to seventy-five percent of the much lower, actual purchase price rather than seventy to seventy-five percent of the inflated price. Thus, even assuming the false statements concerning the down payment were not material, the jury verdict would have been the same for Count 32.

Because, for each of these land-acquisition fraud counts, no jury rationally could have concluded that the element of materiality had not been established, the district court's instructional error was harmless.

### B. Development Loans

#### 1. Cedar Creek and Southern Grove

■■ Counts 34 and 35 charged Neder with committing mail fraud in meeting Amerifirst's and Security's pre-construction sales requirements for the Cedar Creek and Southern Grove development loans, respectively. Neder met these development loan requirements through a scheme in which he solicited individuals to sign reservation agreements or sales contracts indicating their interest in or commitment to buying condominium units to be constructed at Cedar Creek and Southern Grove and then paid the deposits for those purported buyers. The language of the contracts did not reveal that it was Neder rather than the purported buyers who made the deposits, nor did Neder disclose to Amerifirst or Security that he paid the deposits.[8]

Neder claims that his representations about the deposits were not material be-

cause Amerifirst and Security knew or should have known he was making these deposits. Neder points out that the reservation agreements and purchase contracts he submitted to Amerifirst and Security did not expressly state that the purchaser made the deposit; as a result, Neder contends that the contracts were "literally true." At trial, Neder also introduced evidence that "equity sharing" agreements, where a developer would pay a deposit or down payment to provide an incentive for an individual to sign a purchase contract, were an accepted practice, common in the 1980s. According to Neder, if Amerifirst or Security truly cared who paid the deposits, they could have contacted the buyers to ask about the source of the deposits or clearly stated in the loan agreements that only the buyer, and not Neder, could make the deposit.

Neder's arguments relate to what Amerifirst and Security knew or should have known about who was making the required deposits, whether Amerifirst and Security reasonably relied on Neder's representations, and whether Neder's representations were actually false. Whether the element of falsity was satisfied for Counts 34 and 35 was already decided by the jury and is not an issue on remand. *See Neder,* 527 U.S. at ——, 119 S.Ct. at 1834, 1841. As for the other issues Neder raises, Neder's arguments about actual knowledge and reasonable reliance miss the point of the materiality inquiry, which is whether the falsehoods at issue had a tendency to influence or were capable of influencing Amerifirst's and Security's decisions about Neder's development loans. *See Gaudin,*

8. Neder also was charged with forging buyers' signatures on two of the Southern Grove reservation agreements. Neder does not appear to contest the materiality of these forged signatures. Even if he did, the evidence clearly indicates that these signatures tended to influence or were capable of influencing Security's decision about Neder's Southern Grove development loan. Security's loan officer testified that Security required Neder to submit twenty-five reservation agreements to establish the marketability of the Southern Grove project, and that marketability was an important consideration for Security in determining whether to lend money to this type of project. From Security's perspective, these two signatures represented two interested, potential purchasers of Southern Grove condominium units. Because these signatures clearly tended to influence or were capable of influencing Security's decision, no jury rationally could have found that this evidence was not material.

515 U.S. at 509, 115 S.Ct. at 2313; *Gregg,* 179 F.3d at 1315.

The tendency and capability of Neder's representations to influence Amerifirst's and Security's decisions were established by overwhelming evidence. Loan officers from both Amerifirst and Security testified that the reason they wanted Neder to establish that a certain number of prospective purchasers had signed either reservation agreements or purchase contracts and had made the required down payments was to provide an indication of the marketability of the condominiums Neder planned to build at Cedar Creek and Southern Grove, respectively. According to the loan officers, this marketability information was of great importance because it allowed them to gauge whether Neder would be able to make enough sales to repay the loan—in other words, the risk involved in lending money for the projects' development. The information that Neder had to offer to pay deposits to induce people to sign reservation agreements and contracts for Cedar Creek and Southern Grove would have indicated that the market for these condominiums was not as strong as Neder represented and that the risk involved in lending money for development would be greater. Because of the tendency and capability of Neder's representations to influence Amerifirst's and Security's decisions about these development loans, no jury rationally could have concluded that the representations were not material. Thus, the district court's failure to instruct on materiality was harmless error as to these counts.

### 2. *Reddie Point*

 Counts 78 to 84 charged Neder with committing wire fraud through a scheme in which he submitted false invoices to support draw requests on a loan he had obtained from the Union for construction at Reddie Point. Through these invoices and draw requests, Neder falsely represented that he had paid for work performed at Reddie Point when, in reali-ty, he had not paid for the work or the work was not actually performed at Reddie Point.

As part of his defense to these charges, Neder testified that the Union's representatives, Adler and Burns, had authorized and encouraged Neder to make false construction draw requests and knew that Neder was submitting false invoices to support his false draw requests. Adler and Burns testified to the contrary. According to Neder, this conflicting testimony raises a credibility issue relating to materiality that should have been resolved by the jury. Neder reasons that if the jury believed his testimony that Adler and Burns knew Neder's representations were false and still disbursed the funds Neder requested, the jury rationally could have found that Neder's representations did not actually influence the Union's decision about whether to pay the draw requests.

However, as the Government correctly responds, Neder's arguments relate to his intent in submitting the false draw requests and the Union's knowledge of the falsity of those requests but not to the materiality of Neder's false representations about his expenditures and the work completed at Reddie Point. As discussed previously, false statements can be material even if a decision maker was not actually influenced by those statements and knew they were false. *See Johnson,* 139 F.3d at 1364. Again, what is relevant to the materiality inquiry is whether Neder's representations have "a natural tendency to influence, or [are] capable of influencing, the decision of the decisionmaking body to which [they are] addressed"—here, the Union's decision to pay Neder's draw requests. *See Gaudin,* 515 U.S. at 509, 115 S.Ct. at 2313.

The evidence established that, under the loan agreement, the Union agreed to reimburse Neder only for work actually performed at Reddie Point, not for future work at Reddie Point or for work performed at other projects. Consequently, Neder's representations in the draw re-

quests about the amounts he had expended for work performed at Reddie Point were capable of influencing the Union's decision about whether to pay Neder's draw requests and, if so, how much money should be disbursed to Neder. Because this evidence overwhelmingly indicates the materiality of Neder's representations, it is clear beyond a reasonable doubt that the jury verdict on these counts would have been the same absent the district court's instructional error. Thus, the instructional error was harmless.

### 3. The View

▮ In Count 77, Neder was charged with attempted bank fraud for falsely representing to Central Bank that there was a legitimate $280,000 second mortgage on The View property and that the second mortgage was in favor of an existing trust. Neder sought to have Central Bank pay the $280,000 second mortgage as part of a development loan for The View project.

Neder challenges the materiality of his representation that the $280,000 mortgage was in favor of an existing trust, arguing that he presented evidence that he was in the process of creating the trust at the time he made the representation and thus it was not material. However, with this argument, Neder is addressing the falsity, and not the materiality, of his representation about the existence of the trust.

The evidence overwhelmingly establishes that Neder's representations about the existence and amount of this second mortgage had a natural tendency to influence, or were at least capable of influencing, Central Bank's decisions to commit to the loan and to agree to pay the outstanding balance of the existing debt on the property. For instance, the testimony of Central Bank's loan officer clearly indicates that the existence and amount of the $280,000 mortgage were facts crucial to Central Bank in making these decisions. Based on the evidence, a jury could not rationally have concluded that Neder's representations were not material. In

other words, the failure to instruct on materiality did not contribute to the verdict obtained. Thus, the district court's instructional error was harmless with respect to this count.

### III. CONCLUSION

Because we have determined the district court's failure to instruct the jury on materiality was harmless error, we affirm Neder's convictions for bank fraud, mail fraud, and wire fraud. In light of this disposition, we find it unnecessary to review Neder's convictions for Counts 1, 89, and 90—the general conspiracy and RICO violations counts predicated on the mail and wire fraud charges.

AFFIRMED.