[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 17-10944

_____

OUTOKUMPU STAINLESS USA, LLC,

SOMPO JAPAN INSURANCE COMPANY OF AMERICA,

as subrogee of Outokumpu Stainless USA, LLC,

POHJOLA INSURANCE LIMITED,

AIGEL EUROPE LIMITED,

as subrogee of Outokumpu Oyj,

TAPIOLA GENERAL MUTUAL INSURANCE COMPANY,

as subrogee of Outokumpu Oyj,

AXA CORPORATE SOLUTIONS ASSURANCE SA UK BRANCH,

as subrogee of Outokumpu Oyj,

HDI GERLING UK BRANCH,

as subrogee of Outokumpu Oyj,

MSI CORPORATE CAPITAL LTD.,

as sole Corporate Member of Syndicate 3210,

2                    Opinion of the Court                    17-10944

as subrogee of Outokumpu Oyj,
ROYAL & SUN ALLIANCE, PLC,
as subrogee of Outokumpu Oyj,

                                        Plaintiffs-Appellants,

SOMPO JAPAN INSURANCE COMPANY OF AMERICA, et al.,

                                                    Plaintiffs,

*versus*

COVERTEAM SAS,
a foreign corporation now known as
GE Energy Power Conversion France SAS, Corp.,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:16-cv-00378-KD-C

_____

**ON REMAND FROM THE SUPREME COURT OF THE
UNITED STATES**

Before TJOFLAT and JULIE CARNES, Circuit Judges, and BLOOM,[*] District Judge.

JULIE CARNES, Circuit Judge, and BLOOM, District Judge:

This appeal is on remand from the United States Supreme Court, which reversed our decision in *Outokumpu Stainless USA, LLC v. Converteam SAS*, 902 F.3d 1316 (11th Cir. 2018) ("*Outokumpu II*"). *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020) ("*Outokumpu III*").

## I.    Background

The district court compelled Plaintiff Outokumpu Stainless USA, LLC, and its insurers (collectively, "Outokumpu") to arbitrate their Alabama state law claims against Defendant GE Energy Power Conversion France SAS, Corp. (formerly known as Converteam SAS) ("GE Energy"). *See Outokumpu Stainless USA LLC v. Converteam SAS*, No. CV 16-00378-KD-C, 2017 WL 401951, at *3–6 (S.D. Ala. Jan. 30, 2017). Outokumpu's predecessor had executed three contracts with Fives (then F.L. Industries, Inc.) for the provision of cold rolling mills used for manufacturing and processing steel products (the "Contracts"). The Contracts contained

---

[*] Honorable Beth Bloom, United States District Judge for the Southern District of Florida, sitting by designation.

an arbitration clause covering "[a]ll disputes arising between both parties in connection with or in the performance of the Contract[.]"

The Contracts defined Outokumpu as the "Buyer" and Fives as the "Seller," and referred to "Buyer" and "Seller" "individually as 'Party' and collectively as 'Parties.'" But the Contracts also provided that "[w]hen Seller is mentioned it shall be understood as Sub-contractors included, except if expressly stated otherwise." The Contracts defined "Sub-contractor" as "any person (other than the Seller) used by the Seller for the supply of any part of the Contract Equipment, or any person to whom any part of the Contract has been sub-let by the Seller[.]" Appended to each contract was a subcontractor list that enumerated the "Preferred Brands or Manufacturers" for Outokumpu and Fives. GE Energy was on that list.

Outokumpu and GE Energy disagreed over the meaning of "both parties" in the arbitration clauses. Outokumpu argued to the district court that "both parties" meant only the signatories to the Contracts, excluding GE Energy. GE Energy argued that "both parties" included the "Buyer" and "Seller," and "Seller" is understood to include subcontractors, like itself. The district court agreed with GE Energy, concluding "that the plain language of the arbitration provisions . . . supports a reasonable interpretation that subcontractors are not expressly excluded from the meaning of 'parties' in the arbitration provisions." *Outokumpu I*, 2017 WL 401951, at *4. Based on that conclusion, the district court did not reach GE Energy's equitable estoppel argument. *Id.* at *1 n.1.

We reversed, holding that there was no "agreement in writing" as required by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"). *Outokumpu II*, 902 F.3d at 1325. We reasoned that Article II of the Convention mandated that an agreement in writing be "signed by the parties." *Id.* (quoting New York Convention, Article II, ¶ 2). Accordingly, given that GE Energy was "undeniably not a signatory to the Contracts," we concluded that GE Energy could not enforce the arbitration clauses, and that the parties could not "contract around the Convention's requirement that the parties *actually sign* an agreement to arbitrate their disputes in order to compel arbitration." *Id.* at 1326 (emphasis in original).

We further determined that GE Energy could not compel arbitration through estoppel. *Id.* at 1326–27. We recognized that Chapter 1 of the Federal Arbitration Act ("FAA") allows for estoppel "because Chapter 1 does not expressly restrict arbitration to the specific parties to an agreement." *Id.* (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)). But our view was that "the Convention, as codified in Chapter 2 of the FAA, only allows the enforcement of agreements in writing signed by the parties and Congress has specified that the Convention trumps Chapter 1 of the FAA where the two are in conflict." *Id.* at 1326 (citing 9 U.S.C. § 208).

The Supreme Court reversed, holding "that the New York Convention does not conflict with the enforcement of arbitration

agreements by nonsignatories under domestic-law equitable estoppel doctrines." *Outokumpu III*, 140 S. Ct. at 1648. The Supreme Court reasoned that the Convention was "simply silent on the issue of nonsignatory enforcement." *Id.* at 1645. According to the Supreme Court, "[t]his silence is dispositive here because nothing in the text of the Convention could be read to otherwise prohibit the application of domestic equitable estoppel doctrines." *Id.*

The Supreme Court specifically disagreed with our reading of Article II of the Convention as requiring "that the parties *actually sign* an agreement to arbitrate their disputes in order to compel arbitration." *Outokumpu III*, 140 S. Ct. at 1647–48 (emphasis in original). According to the Supreme Court, the provisions in Article II "address the recognition of arbitration agreements, not who is bound by a recognized agreement. Article II(1) simply requires contracting states to 'recognize an agreement in writing,' and Article II(2) defines the term 'agreement in writing.'" *Id.* at 1648. "Here, the three agreements at issue were both written and signed," satisfying Article II. *Id.*

The Supreme Court rounded off its opinion by noting that since we had "concluded that the Convention prohibits enforcement by nonsignatories, [we] did not determine whether GE Energy could enforce the arbitration clauses under principles of equitable estoppel or which body of law governs that determination," adding that "[t]hose questions can be addressed on remand." *Id.* at 1648. The Supreme Court remanded the matter to us "for further proceedings consistent with this opinion." *Id.*

Justice Sotomayor authored a concurrence, emphasizing that "[a]ny applicable domestic doctrines must be rooted in the principle of consent to arbitrate." *Id.* (Sotomayor, J., concurring). Thus, in her view, parties "may not rely on domestic nonsignatory doctrines that fail to reflect consent to arbitrate." *Id.* But she also observed, "I am skeptical that any domestic nonsignatory doctrines need come into play at all, because Outokumpu appears to have expressly agreed to arbitrate disputes under the relevant contract with subcontractors like GE Energy." *Id.* at 1649 n.★.

On remand, we ordered the parties to provide supplemental briefing "addressing the impact of the Supreme Court's decision," which they did. GE Energy argues that the Supreme Court eliminated our premise that only signatories to the Contracts could enforce arbitration. As such, GE Energy contends we may find that GE Energy can compel arbitration as a non-signatory party. Alternatively, GE Energy maintains that it may compel arbitration under the doctrine of equitable estoppel or as a third-party beneficiary to the Contracts. Finally, GE Energy submits that Outokumpu forfeited the application of German law by not raising it below, that United States law applies in any event, and that German law allows GE Energy to arbitrate, anyway.

Outokumpu argues that we should apply German law to the question of arbitrability, and that German law does not recognize the versions of equitable estoppel that GE Energy proposes. Alternatively, Outokumpu contends that GE Energy cannot compel arbitration under either Alabama law or federal common law

because arbitration is limited to disputes between "both parties" to the Contracts, *i.e.*, the signatories, and because GE Energy's versions of equitable estoppel require an active arbitration and reliance on the Contracts, neither of which is present here. Outokumpu also submitted the declaration of a German lawyer, who opines on the question of equitable estoppel under German law.

## II.    Analysis

Although true that "[t]his case implicates domestic equitable estoppel doctrines," *Outokumpu III*, 140 S. Ct. at 1644, we need not, and do not, resolve this case on those alternative grounds. That is because while "GE Energy is undeniably not a signatory to the Contracts," *Outokumpu II*, 902 F.3d at 1326, it is equally undeniable that GE Energy is a defined party covered by the arbitration clause.

The Contracts define parties to mean the Buyer and Seller collectively, and the Seller is understood to include Fives *and* sub-contractors, unless the contract states otherwise. The arbitration clause broadly covers "[a]ll disputes arising between both parties in connection with or in the performance of the [Contracts]," without expressly excluding sub-contractors. Therefore, Outokumpu, the Seller, expressly agreed to arbitrate disputes that arise with Fives *and* sub-contractors. Based on this conclusion, we need not address GE Energy's alternative arguments based on the doctrines of equitable estoppel and third-party beneficiaries, nor do we need to undertake a choice-of-law analysis or decipher German law.

17-10944                Opinion of the Court                9

This case is readily distinguishable from *Daphne Auto., LLC v. E. Shore Neurology Clinic, Inc.*, 245 So. 3d 599 (Ala. 2017), the case that Outokumpu relies on for its contention that the arbitration clauses do not extend to GE Energy. In *Daphne*, the arbitration provision stated that "Buyer/lessee and dealer agree that all claims, demands, disputes or controversies of every kind or nature that may arise between them" shall be settled by binding arbitration. *Id.* at 601 (emphasis in original). An individual employed by a company hired his nephew and provided him a company car as part of his compensation. *Id.* The car dealership agreed that the vehicle would be titled in the nephew's name, and the nephew was the buyer/lessee under the sales contract. *Id.* When a dispute between the company and the dealership arose, the Alabama Supreme Court held that the dealership could not compel arbitration because the arbitration clause was limited, by its terms, to disputes "between them", i.e., the "buyer/lessee" (nephew) and the "dealer[ship]." and "buyer/lessee" was not defined to include both the nephew and the company that employed him. *Id.* at 605. Here, GE Energy is a defined "party" and entitled to enforce the arbitration clauses contained in the Contracts.

Finally, our conclusion is entirely consistent with the Supreme Court's opinion, and thus complies with the mandate. In *Outokumpu II*, "our inquiry start[ed] and end[ed]" with our determination that "there is no agreement in writing within the meaning of the Convention" because the Convention requires a party to actually sign the agreement. *Outokumpu II*, 902 F.3d at 1326. The

Supreme Court disagreed with that foundational premise. *Outokumpu III*, 140 S. Ct. at 1647–48. Our inquiry now continuing past the "agreement in writing" factor, we agree with the district court that Outokumpu simply agreed to arbitrate with GE Energy per the contract's plain terms.

## III.    Conclusion

Based on the foregoing, we **AFFIRM** the district court's order compelling arbitration.

17-10944        TJOFLAT, J., Specially Concurring        1

TJOFLAT, Circuit Judge, Specially Concurring:

I agree with the Court's outcome that GE Energy may compel arbitration.  But I take another well-traveled path to arrive to that conclusion, one based on the mandate rule.  For that reason, I concur only in the Court's judgment.

## I.

In a nutshell, our panel opinion held that GE Energy, which had not signed the international agreement that existed between Outokumpu and Fives, could not compel arbitration against Outokumpu.  We came to that conclusion based on the plain language of the New York Convention, which allows one party to compel arbitration against another when there is an "agreement in writing."  New York Convention, Article II, ¶ 2.  We considered in the alternative GE Energy's argument that some version of equitable estoppel would apply such that GE Energy could compel arbitration against Outokumpu as a nonsignatory to the agreement between Outokumpu and Fives.  We rejected that argument on the premise that estoppel doctrine could not contravene the plain language of the New York Convention.  We, therefore, reversed the district court's determination that GE Energy could compel arbitration.

GE Energy filed a petition for writ of certiorari.  The question presented was, "Whether the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") permits a nonsignatory to an arbitration agreement to

2                TJOFLAT, J., Specially Concurring            17-10944

compel arbitration based on the doctrine of equitable estoppel." Petition for Writ of Certiorari, *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 139 S. Ct. 2776 (2019) (No. 18-1048).  And that question is exactly what the Supreme Court addressed in *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637 (2020).  In short, the Supreme Court reversed us.  The Supreme Court held that although it is true that arbitration agreements *must be* enforced when the provisions of Article II are met (i.e., when there is an agreement in writing between the parties), arbitration agreements *may also be* enforced by nonsignatories under domestic law doctrines because "domestic doctrines [] fill gaps in the [New York] Convention." *GE Energy*, 140 S. Ct. at 1645.  In other words, the New York Convention is not the exclusive means by which an international arbitration agreement may be enforced because domestic law doctrines that do not conflict with the Convention may apply.  *See id.*  And, the kicker, the Supreme Court explained, is that "the New York Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines." *Id.* at 1648.

Then, the Supreme Court sent the case back to us with a clear directive:

> Because the Court of Appeals concluded that the Convention prohibits enforcement by nonsignatories, the court did not determine whether GE Energy could enforce the arbitration clauses under principles

17-10944         TJOFLAT, J., Specially Concurring            3

> of equitable estoppel or which body of law governs that determination. **Those questions can be addressed on remand.**

*Id.* (emphasis added). In my view, because the Supreme Court directed us to address the equitable estoppel issue on remand, that's exactly (and only) what we should address in this opinion.

First, I will lay out why we must address equitable estoppel in this remand. Second, I will address what body of law governs the equitable estoppel determination. Third, I will analyze the equitable estoppel issue accordingly.

## II.

The resolution of this case on remand is governed by the law of the case doctrine and its more specific variant, the mandate rule. *See Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985). We may not "alter, amend, or examine the mandate, or give any further relief or review," when the Supreme Court sends a case back down to us. *Id.* at 1119. We must "implement both the letter and the spirit of the mandate." *Id.* To determine what the mandate is, we must look at the Supreme Court's decision "and the circumstances it embraces." *Id.* And we are "bound to follow the [Supreme Court's] holdings, both express and implied." *Id.* In short, when a party does not "raise [h]is challenge . . . before the Supreme Court, and the Supreme Court remand[s] th[e] case for us to consider" a specific issue, *United States v. Neder*, 197 F.3d 1122, 1124 n.1 (11th Cir. 1999), "we are limited to deciding only" what the Supreme Court has directed us to consider on remand, *id.* at 1131.

4                TJOFLAT, J., Specially Concurring            17-10944

Applying the mandate rule to our case, our analysis should be limited to whether GE Energy may compel arbitration under the doctrine of equitable estoppel and what body of law should apply in making that determination. *GE Energy*, 140 S. Ct. at 1648. The world of arguments is not our oyster on remand from the Supreme Court. So, for that reason, I would limit our review to equitable estoppel—the issue the Supreme Court remanded to us.

### III.

Now, turning to the merits of the remand, we must first decide what body of law governs our determination of whether GE Energy, a third party which did not originally sign the agreement between Outokumpu and Fives, may compel arbitration against Outokumpu. Let me get it out of the way that German law will govern the substantive issues in the case, as the choice of law provision in the contract between Outokumpu and Fives dictates. But we aren't dealing with the substantive issues in the appeal right now. We are dealing with the threshold inquiry of arbitrability—that is, whether GE Energy can compel arbitration against Outokumpu.

And the Federal Arbitration Act ("FAA"), which governs international arbitrations like the one at issue in this case, "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983); *see* 9 U.S.C. § 208 (explaining that domestic law under Chapter 1 of the FAA applies to New York Convention arbitrations to the extent that Chapter 1 does not conflict with Chapter 2 of the FAA (governing international arbitrations) or the New

17-10944        TJOFLAT, J., Specially Concurring        5

York Convention itself); *see also BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34, 134 S. Ct. 1198, 1206 (2014) ("[C]ourts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about 'arbitrability.'").

Although this is a question of first impression in our Circuit, I think all signs point to the conclusion that we must apply federal common law in determining whether equitable estoppel applies in New York Convention cases. Under *Boyle v. United Technologies Corporation*, 487 U.S. 500, 506–07, 108 S. Ct. 2510, 2515 (1988), the Supreme Court laid out a two-part test for determining whether federal common law should apply over state law (or any other law for that matter). First, we must decide whether there is a "uniquely federal interest." *Id.* at 507, 108 S. Ct. at 2516. Second, we must determine whether "application of state law would 'frustrate specific objectives' of federal legislation." *Id.* (internal citation omitted).

Here, as to the first part of the test, we have a quintessential "uniquely federal interest." *Boyle*, 487 U.S. at 507, 108 S. Ct. at 2516. The New York Convention is an international treaty with international obligations. The whole goal of the New York Convention is to standardize the enforcement of international arbitration agreements, and there is a strong federal interest in making sure that the United States lives up to its treaty obligations. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15, 92 S. Ct. 2449, 2457 n.15 (1974) ("The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and

arbitral awards are enforced in the signatory countries."). As to the second part of the test, allowing each state or international law to impose its own test for threshold questions of arbitrability would create an unmanageable tangle of arbitration law in the United States, lead to forum shopping, and frustrate the uniform standards the New York Convention and Chapter 2 of the FAA were enacted to create. *See also id.* ("In their discussion of [Article II of the New York Convention], the delegates to the Convention voiced frequent concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements.").

In short, the *Boyle* test counsels in favor of applying federal common law to threshold questions of arbitrability, which include the application of equitable estoppel to GE Energy's attempt to compel arbitration as to Outokumpu. *Cf. Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) ("In cases involving the New York Convention, in determining the arbitrability of federal claims by or against nonsignatories to an arbitration agreement, we apply 'federal substantive law,' for which we look to the 'ordinary contract and agency principles.'" (internal citation omitted)); *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 576–77 (7th Cir. 2007) ("[S]upport grew, both within and outside the United States, for a uniform, economical and efficient means of resolving international commercial disputes with American citizens and entities."); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) ("When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law,

17-10944          TJOFLAT, J., Specially Concurring          7

which is already well-developed, to the question of whether an agreement to arbitrate is enforceable.").

## IV.

Now, all that's left is to apply the federal common law notions of equitable estoppel to the facts of this case. Starting with federal equitable estoppel principles, there are two circumstances in which "a nonsignatory [may] compel arbitration." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631, 129 S. Ct. 1896, 1902 (2009). The first is where "the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *Id.* (internal citation omitted). The second is where the signatory "raises allegations of" collusive misconduct between the nonsignatory and other signatories to the contract. *Id.* GE Energy may compel arbitration under the first circumstance because Outokumpu is relying entirely on its contract with Fives to litigate against Fives' subcontractor GE Energy. Because GE Energy, a nonsignatory, is facing litigation as a result of Outokumpu's agreement with Fives, it may compel arbitration in this circumstance.

So, I end up in the same spot as the Court. I just use equitable estoppel to get there. For that reason, I concur in the judgment only.