FILED
United States Court of Appeals
Tenth Circuit

March 8, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES DEWEY MOSER,

Defendant - Appellant.

No. 10-3229
(D.C. No. 5:06-CR-40068-JAR-7)
(D. Kan.)

---

ORDER AND JUDGMENT[*]

---

Before **KELLY**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

---

Like many Americans James Moser hoped to make a few dollars in real estate. Unlike most, Mr. Moser eventually found himself convicted of four counts of bank fraud and one count of conspiracy. On appeal Mr. Moser argues that the evidence the government produced against him at trial is legally insufficient to support his convictions. But under our governing standard of review, Mr. Moser faces a serious challenge. This court's precedents require us to examine the trial evidence against Mr. Moser in the light most favorable to the jury's verdict and

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

we may only reverse if we are persuaded no rational jury could have found him guilty beyond a reasonable doubt.  *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007).  Here we cannot say so much.

Beginning with the substantive bank fraud counts, Mr. Moser contends that he lacked an intent to deceive a bank or knowledge of any misrepresentation made to a bank.  *See United States v. Rackley*, 986 F.2d 1357, 1360-61 (10th Cir. 1993) (bank fraud requires proof, among other things, "(1) that the defendant knowingly executed or attempted to execute a scheme . . . to obtain property by means of false or fraudulent pretenses . . .  (2) that the defendant did so with the intent to defraud").  The trial record, however, contains ample circumstantial evidence suggesting the presence of both elements.

The record shows that Mr. Moser partnered with Joseph Frey (now deceased) to secure bank loans in order to buy a large number of homes from a Kansas City builder, Jeffrey Miller.  At the same time, the pair secretly arranged for Mr. Miller to return some of the loan proceeds to Mr. Moser and his company.  These "kickbacks" provided substantial income to Mr. Moser and were either never disclosed to the lending banks or were disguised as bogus fees.  *See, e.g.*, Exhibit 44L-1.  To obtain the bank loans needed to purchase Mr. Miller's properties and the kickbacks that came with them, Mr. Frey, assisted by Mr. Moser, engaged in still more deceptions, misrepresenting himself and his assets to the lending banks in a variety of ways.  On three loans, for example, Mr. Frey

represented that he worked for and received a substantial income from Mr. Moser's company, this despite Mr. Frey's wife's testimony that he never did so. Tr. at 1385.

Of course, Mr. Moser denies knowing Mr. Frey misrepresented his employment status. But even assuming he wasn't in on this particular aspect of the scheme the jury easily could have found he was in on many others. To win the bank loans needed to purchase the Miller properties, for example, Mr. Frey submitted paperwork purporting to show he already had a signed lease with a prospective renter who promised to provide a steady stream of income from one of the homes. Tr. at 1193 *et seq*. The lease purported to be between Mr. Frey — repeatedly misspelled "Fry" — and Tony Hilger, and a copy of it was submitted with each of the loan applications underlying Mr. Moser's convictions. Tr. at 1335-37, 1195-98, 1208-1212; Exhibits 30T, 41E, 44E, 45E. At trial, however, Mr. Hilger testified that he never entered into a lease with Mr. Frey and that the signature on the lease was not his. Tr. at 1702-04. Neither, it turns out, did Mr. Hilger even know Mr. Frey. Tr. at 1703. Mr. Hilger, however, did know Mr. Moser. And Mr. Frey's wife testified that it was Mr. Moser's job to find purported renters to lease the properties for Mr. Frey. Tr. at 1390. Consistent with Mrs. Frey's testimony, three copies of the lease bore the fax tag line of Mr. Moser's company. Exhibits 41E, 44E, 45E.

This evidence is enough to support the jury's conclusion that Mr. Moser was knowingly involved in the scheme to defraud the banks and that he intended to defraud them. From Mr. Hilger's testimony the jury could have concluded that the leases were intentional lies aimed at deceiving the banks into thinking Mr. Frey had at least one property rented and with it a steady income stream that might help justify a loan. Mr. Moser's knowing involvement likewise reasonably follows from Mrs. Frey's testimony about his role, from Mr. Hilger's testimony that he knew Mr. Moser but not Mr. Frey, from the fax tag line on three copies of the lease, and perhaps from the evidence that Frey's name was consistently misspelled in the lease (arguably suggesting Mr. Frey didn't author it). The jury likewise had reason to believe that Mr. Moser had a motive for helping to mislead the banks as he stood to profit from the scheme, including through the kickbacks his company received. *See United States v. Archer*, --- F.3d ----, 2011 WL 4360013, at *8 (2d Cir. 2011) (sufficient evidence that defendant attorney, and not solely his office manager, knowingly filed false visa applications for clients where clients spoke little English and did not provide the false information, they did not know the program's requirements, they spoke with defendant, and defendant responded "so what?" when confronted with one false application).

Mr. Moser intimates that no adverse inferences should be drawn from Mrs. Frey's testimony because it was called into question on cross-examination. But cross-examination didn't call into question Mrs. Frey's testimony that Mr. Moser

was responsible for obtaining leases on the partners' properties; to the contrary, this testimony was elicited on cross. Even if cross-examination did call into question *other* aspects of Mrs. Frey's testimony, moreover, the jury was permitted to find her credible in *this* respect, the only respect necessary to sustain Mr. Moser's conviction. Under our governing standards of review, a jury's credibility determination may be overturned "only if the testimony is inherently incredible — that is, only if the events recounted by the witness were impossible 'under the laws of nature' or the witness 'physically could not have possibly observed' the events at issue." *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) (quoting *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (further quotation omitted)). And neither of those conditions is present here because no one disputes that Mrs. Frey was at least possibly in a position to know something about her husband's business partners and activities.

Separate and apart from whether he knowingly participated in the scheme and intended to deceive lenders, Mr. Moser contends that his substantive bank fraud convictions fail because the government didn't prove that any of his deceptive conduct was material to the banks' decisions to lend Mr. Frey money. A false statement is material for purposes of a bank fraud conviction, however, so long as it is (merely) "*capable* of influencing a bank's actions." *See United States v. Akers*, 215 F.3d 1089, 1101-02 (10th Cir. 2000) (quotation omitted) (emphasis added). And here again the Hilger lease supplies sufficient evidence to

support the jury's verdict. Loan officers testified that the leases were normally submitted with loan applications in order show that the borrower could guarantee a reliable stream of rental income. Tr. 1209-10; 1336-37. From this evidence a reasonable jury could conclude that the Hilger lease appended to Mr. Frey's loan applications was at least capable of influencing a bank's loan decision. Mr. Moser's reply to all this — that the government failed to prove other material impacts flowing from the fraudulent scheme — is beside the point. The government proved all the materiality it was required to prove when it showed Mr. Moser's participation in the creation of the Hilger lease was "capable of influencing" the banks' actions.

We also conclude sufficient evidence existed to sustain Mr. Moser's conviction of conspiracy to commit bank fraud. For this charge, the jury had to find that "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). Mr. Moser contends the evidence produced against him was legally insufficient on the first three elements — that he did not agree with Mr. Frey to defraud lenders, he did not know their business venture was aimed at doing so, and he did not knowingly or voluntarily participate in any fraud.

But Mr. Moser's involvement with the Hilger lease alone once again suffices to satisfy each of these elements. From it a rational jury was free to conclude that Mr. Moser agreed to commit bank fraud with Mr. Frey — that Mr. Frey was the borrower on the loans for which Mr. Moser contributed the false Hilger lease to help bolster Mr. Frey's loan applications. A rational jury was also free to conclude from the lease that Mr. Moser knew he and Mr. Frey intended to misrepresent Mr. Frey's credit-worthiness by purporting to show lease income Mr. Frey didn't have. And, finally, from the document a rational jury was able infer that Mr. Moser knowingly and voluntarily participated in the scheme.

Affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge