**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATTHEW WILLIAMS,

    Defendant - Appellant.

No. 16-3220

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:15-CR-20034-CM-1)**
_____

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Federal Public Defender, and Thomas W. Bartee, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender for the District of Kansas, Topeka, Kansas, appearing for Appellant.

Carrie N. Capwell, Assistant United States Attorney (Thomas A. Beall, United States Attorney, with her on the brief), Office of the United States Attorney for the District of Kansas, Kansas City, Kansas, appearing for Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

A jury convicted Matthew Williams of bank fraud in violation of 18 U.S.C.

§ 1344(1), and aggravated identity theft in violation of 18 U.S.C. § 1028A. He

appeals and asks that we reverse his convictions because the evidence against him was insufficient.

Mr. Williams began a mortgage loan application at Pulaski Bank (the "bank") using his father's personal and financial information and his status as a Purple Heart veteran. After his father received the application packet in the mail, he called the bank to explain he had not applied for a loan. The bank referred the matter to law enforcement, but continued to work with Mr. Williams to process the loan and obtain additional documents to clarify the applicant's identity. The bank sent Mr. Williams a notice of incompleteness because it lacked several required documents, signatures, and a photo identification. In response, Mr. Williams provided some of the required documents to the bank, including a fake earnings statement and a letter expressing his intent to proceed with the loan. The bank sent a final notice of incompleteness to Mr. Williams. Mr. Williams did not respond, and the bank closed his application file.

Mr. Williams argues his misrepresentations on the incomplete application could not support a bank fraud conviction because they (1) were not material to the bank's decision to issue him a loan; and (2) did not impose a risk of loss on the bank. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Williams's bank fraud and aggravated identity theft convictions.

## I.   BACKGROUND

### A.  *Factual History*

Mr. Williams challenges the sufficiency of the government's evidence, which requires us to view the evidence in the light most favorable to the Government.  We present the factual background accordingly.

### 1.  **Bank Processes**

The testimony at trial established that the bank has a four-step process for issuing mortgage loans:  (1) application; (2) processing; (3) underwriting; and (4) closing.  Each step has its own verification processes and safeguards.

First, in the application phase, a loan officer:

- Helps a potential borrower fill out a preliminary application;

- Runs a credit report;

- Requests verification documents, such as a photo identification ("ID"), pay stubs, bank statements, and tax returns; and

- Adjusts the information on the preliminary application as necessary based on the verification documents.

Preliminary applications for a loan guaranteed by the U.S. Department of Veterans Affairs (a "VA loan") require an addendum confirming the VA will insure the loan.  The loan application packet consists of the preliminary application, the VA addendum, around 30 disclosures to the borrower that require signatures,[1] and a letter indicating the

---

[1] One disclosure is a truth-in-lending document that the bank provides to the potential borrower to facilitate shopping for the best loan.

borrower's intent to proceed.[2]  The borrower must sign and date all of the documents in

the packet and return them to the bank.

Second, at the processing step, a processor reviews the borrower's credit report,

calculates available income, verifies the reported income, and reviews the application

packet.  The bank generally requires a complete preliminary application packet before

advancing the loan to this second stage.  The bank will sometimes overlook deficiencies

in completeness to advance a loan.  An employee said:

> Well, they're supposed to date it but we do have people who
> don't date it.  We don't not [sic] accept it if it's not dated . . .
> Well, I mean, they're supposed to date it. . . No, we're not
> going to not accept this application 'cause it's not dated.

ROA, Vol. 2 at 162-63.  She also explained:  "Now, if someone's taking a long time or

maybe we've just got a little bit of documentation, we'll go ahead and turn it in so we can

get the file going.  So, we don't always have all the documentation when it goes to a

processor." *Id.* at 144.

Third, after the processor's work is complete, the application goes to the third

stage:  underwriting.[3]  The underwriter decides whether to approve a loan.  Underwriting

---

[2] A bank employee testified that once the bank has a "valid loan application," it sends the loan application and multiple disclosures to the applicant.  ROA, Vol. 2 at 191.

[3] A bank employee testified that processing "may or . . . may not" still send a file to underwriting even if it doesn't get all the documents it needs. *Id.* at 210.  She stated that, "It depends how much documentation they have, and if they have enough that—underwriting has enough information to give a rendering or an – you know, like a preliminary approval, or if we have—[enough] . . . items to make a decision." *Id.*  "It's possible to forward [the loan application] with some notation in the file, still

Continued . . .

involves review of the applicant's credit report, income, assets, debts, employment history, the home appraisal, and whether the applicant has sufficient funds to make the down payment and pay closing costs. The underwriter's options include suspending the application for additional information, approving it with conditions, or just approving it.

Fourth, if the underwriter approves, the loan goes to the final stage: closing. The closer runs an additional credit search, conducts a title search, and verifies the borrower's employment, title insurance, and homeowner's insurance. The closer also prepares the final loan document for the borrower's signature. Until the completion of closing, the bank does not commit to loaning money.

## 2. **Mr. Williams's Loan Application**

On July 19, 2014, Mr. Williams entered into a contract to purchase a home in Kansas for $480,000.

On July 25, 2014, Mr. Williams called Theresa Mentzel, a loan officer at the bank, to inquire about a loan. She asked him questions to prepare a mortgage application. He falsely told her that his legal name was Earl Williams, who is his father, and provided her with his father's social security number, date of birth, and Texas address.[4] He also gave her, as if it were his own, the name of Earl Williams's current employer, monthly income and expenses, and bank account information. He authorized her to run a credit report on

waiting on X, Y, or Z." *Id.* at 212.

[4] To avoid confusion, we refer to Matthew Williams, the defendant, as "Mr. Williams" and to his father as "Earl Williams."

"Earl Williams," which she did. Mr. Williams told Ms. Mentzel he wished to apply for a VA loan. He said, again falsely, that he was exempt from the high funding fee applicable to VA loans because he had received a Purple Heart and was on VA disability. Ms. Mentzel used this information and obtained a VA certificate of eligibility, which confirmed Earl Williams was a veteran, exempt from paying a funding fee, and qualified for a low interest rate.

On July 30, 2014, the bank sent a copy of the application, which included information provided during Mr. Williams's phone call, and the necessary disclosure forms to Earl Williams's Texas address. Earl Williams received the packet, called the bank, and spoke with Ms. Mentzel's assistant, Judith Atkinson. He told her that he had not applied for a loan and was concerned because the loan application included his social security number. Ms. Atkinson alerted her manager but was told to "just proceed on the loan." ROA, Vol. 2 at 194-95

Denise DeRousse, a senior vice president at the bank with responsibility for monitoring fraud and loss, became involved with the loan application at some point following Earl Williams's call. Ms. Mentzel was unsure "who was who, or who was telling the truth," or whether there had been a mistake and Ms. DeRousse thought "[i]t could still be, in [her] mind, an error" and still viewed Mr. Williams as "a person who might be a potential customer." *Id.* at 227, 228, 181. Aware that critical loan documents were missing, and still viewing Mr. Williams as a potential client whom she did not want to "interrogat[e]," Ms. DeRousse turned the investigation over to law enforcement. *Id.* at 228. She determined the bank was not then at a risk of loss, and she decided she would

not investigate further unless Mr. Williams submitted documents that would allow the bank to proceed with his loan application. She told the bank's mortgage officers to notify her if Mr. Williams provided additional documentation.

Following her manager's directions, Ms. Atkinson called Mr. Williams and asked him to submit the disclosure forms and his photo ID. He said he would come to the bank the following week with the requested documents, but he did not.

On August 8, 2014, Ms. Atkinson emailed Mr. Williams a notice of incompleteness. The notice advised he had 10 business days to provide the requested information or the bank would send a final notice of incompleteness.

On August 19, 2014, Mr. Williams provided the bank with the following documents, all using his father's name: (1) an undated, electronically-signed loan application, (2) two signed but undated disclosure forms, including a notice of intent to proceed with the loan application, and (3) a fake earnings statement showing monthly net wages of $3,275.25. He also arranged for the Defense Finance and Accounting Service to send the bank a letter verifying that Earl Williams was receiving $3,585 in monthly retirement pay. Mr. Williams did not provide a photo ID, which the bank required from every customer.[5]

On August 22, 2014, the bank emailed a final notice of incompleteness to Mr. Williams. The notice advised that he had five business days to provide the requested information, or the bank would close his file. Mr. Williams did not respond with the

---

[5] Ms. Atkinson testified that the loan could not move forward to processing without the photo ID.

required documents, so the bank closed his application. Mr. Williams's application never made it to the underwriting phase because the bank "never had enough documentation—complete documentation to send it to the underwriter." ROA, Vol. 2 at 166.

## B. *Procedural History*

### 1. **Indictment**

A grand jury in the District of Kansas returned a two-count indictment against Mr. Williams. Count 1 charged bank fraud in violation of 18 U.S.C. § 1344(1), and Count 2 charged aggravated identity theft in violation of 18 U.S.C. § 1028A.

### 2. **Trial and Oral Motion for Judgment of Acquittal**

At trial, the Government called nine witnesses. Mr. Williams did not present evidence. The testimony established the facts outlined above.

At the close of the Government's evidence, Mr. Williams moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the bank fraud charge—Count 1—and argued the Government had failed to prove two essential elements: (1) that his statements were material to the bank's decision as to whether to issue him a loan, and (2) that the bank suffered a risk of loss or civil liability. He also argued the aggravated identity theft charge—Count 2—was invalid because it was premised on the bank fraud charge. The district court denied the motion.

The jury found Mr. Williams guilty of both charges.[6]

---

[6] 18 U.S.C. § 1344(1) makes it a crime to "knowingly execute[], or attempt[] to execute, a scheme or artifice . . . to defraud a financial institution." On appeal, Mr. Williams states that "[t]here was some debate below about whether Mr. Williams

Continued . . .

3.  **Post-Trial Motion for Judgment of Acquittal**

Mr. Williams filed a post-trial motion for a judgment of acquittal under Rule 29, reasserting his arguments from the close of evidence.  The district court again denied the motion.  It ruled there was sufficient evidence to show the bank suffered a risk of loss because Mr. Williams submitted a fraudulent loan application and expressed his intent to proceed with it.  The materiality element also was satisfied, the district court ruled, because Mr. Williams applied for a VA home mortgage loan and his misrepresentations influenced the bank's decision whether to issue the loan.  Because the evidence was sufficient on Count 1, the court said it also was sufficient on Count 2.

4.  **Sentencing**

Mr. Williams received a prison sentence of 27 months—three months for bank fraud and 24 months for aggravated identity theft.  The district court also imposed a two-year term of supervised release.

II.  **DISCUSSION**

Mr. Williams challenges the sufficiency of the evidence underlying both of his convictions.  Because the aggravated identity theft conviction was premised on the

---

was charged and convicted of attempted bank fraud, rather than a completed bank fraud." Aplt. Br. at 25 n.7; *see e.g.*, *id.* (explaining indictment did not charge "attempt[] to execute" but attempt language was included in jury instructions); ROA, Vol. 2 at 446 (district court's statement at sentencing that "[a]lthough the bank fraud statute includes the word attempt, defendant was convicted of bank fraud, not attempted bank fraud"). Mr. Williams does not challenge the theory of his conviction or his sentence on appeal, so we do not address those issues. He argues only that the Government failed to prove his misrepresentations (1) were material, or (2) imposed a risk of loss on the bank. *Id.*

bank fraud conviction, the Government and Mr. Williams agree that whether the evidence was sufficient for the bank fraud conviction is the determinative issue on appeal.[7]

Mr. Williams argues the Government failed to prove the first element of bank fraud because it failed to show that his misrepresentations (1) were material, or (2) imposed a risk of loss on the bank. We disagree. Based on the trial evidence, a rational jury could find that Mr. Williams's misrepresentations were both material and imposed a potential risk of loss on the bank.

## A. *General Legal Background*

### 1. **Standard of Review**

"To review [a] sufficiency of the evidence [challenge], we engage in de novo review, considering the evidence in the light most favorable to the government to determine whether any rational jury could have found guilt beyond a reasonable doubt." *United States v. Los Dahda*, 853 F.3d 1101, 1106 (10th Cir. 2017), *petition for cert. filed*, (July 7, 2017) (No. 17-43). "[W]e consider all of the evidence, direct

---

[7] As we explained in *United States v. Camick*, 796 F.3d 1206, 1219 (10th Cir. 2015), the aggravated identity theft statute, 18 U.S.C. § 1028A, prohibits identity theft "during and in relation to" any of the enumerated felonies, including bank fraud. 18 U.S.C. § 1028A(c)(5) (defining "felony violation" to include "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)"). "Thus, a conviction for aggravated identity theft is predicated on the commission of one of the enumerated felonies." *Camick*, 796 F.3d at 1219. If we reverse a conviction for the predicate felony, we must necessarily also reverse an aggravated identity theft conviction that was premised on the now-reversed predicate conviction. *Id.* Because we affirm Mr. Williams's bank fraud conviction, we also affirm his aggravated identity theft conviction.

and circumstantial, along with reasonable inferences[,] . . . [b]ut we do not weigh the evidence or consider the relative credibility of witnesses." *Id.*[8] Thus, our review of the evidence is "highly deferential." *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008) (quotations omitted).

2.  **Bank Fraud**

18 U.S.C. § 1344 states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
>> (1) to defraud a financial institution; or
>>
>> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

"The [bank fraud] statute was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system." *United States v. Akers*, 215 F.3d 1089, 1102 (10th Cir. 2000) (quotations omitted). We note that this broad statute considers even "attempts to execute" as bank fraud. 18 U.S.C. § 1344. It was modeled after the mail and wire fraud statutes, *see* 18 U.S.C. §§ 1341, 1343,

---

[8] *See also United States v. Gallant*, 537 F.3d 1202, 1222-23 (10th Cir. 2008) ("We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury. Rather than examining the evidence in 'bits and pieces,' we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" (quotations and citations omitted)).

and contains "virtually the same language" as those statutes. *United States v. Young*, 952 F.2d 1252, 1255-56 (10th Cir. 1991). Thus, our analysis of bank fraud under § 1344 often draws on mail and wire fraud cases under § 1341 and § 1343.

Mr. Williams was convicted of violating 18 U.S.C. § 1344(1). To establish a violation under § 1344(1), the Government must prove:

> (1) that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution;
>
> (2) that the defendant did so with the intent to defraud the financial institution; and
>
> (3) that the financial institution was federally insured.

*United States v. Swanson*, 360 F.3d 1155, 1161 (10th Cir. 2004) (paragraph breaks added).

Under the first element, a scheme to defraud "can involve fraudulent misrepresentations to deceive a bank to obtain money." *Young*, 952 F.2d at 1257. "[S]cheme and artifice are defined to include . . . fraudulent pretenses or misrepresentations intended to deceive others to obtain something of value, such as money, from the institution to be deceived." *Id.* at 1256 (quotations omitted). The misrepresentation or falsehood must be materially false. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Also subsumed within the first element is a requirement that

- 12 -

the government prove a "risk," "potential risk," or "risk of loss" to the financial institution.  *Swanson*, 360 F.3d at 1161.[9]

## B. *Materiality*

### 1. **Additional Legal Background**[10]

#### a. *Materiality Definition*

A "'false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *United States v. Irvin*, 682 F.3d 1254, 1267 (10th Cir. 2012) (quoting *Neder*, 527 U.S. at 16).  Materiality is a mixed question of law and fact.  *United States v. Schulte*, 741 F.3d 1141, 1154 (10th Cir. 2014); *Gaudin*, 515 U.S. at 511-12.[11]

First, deciding whether a statement is "material" requires the determination of two subsidiary questions:  (a) "what statement was made?" and (b) "what decision was the agency trying to make?"  *Gaudin*, 515 U.S. at 512; *United States v. Camick*,

---

[9] This court's opinion in *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991), used the term "potential risk."  Mr. Williams and the Government concede that this court has "used the phrase 'potential risk of loss' interchangeably with the phrase 'risk of loss.'"  Fed. R. App. P. 28(j) Supplemental Authority (May 26, 2017); Fed. R. App. P. 28(j) Supplemental Authority (May 24, 2017).

[10] The bank fraud materiality analysis is identical to the materiality analysis required for convictions of making a false statement under 18 U.S.C. § 1001, mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1341.  *See Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").  Cases involving bank fraud, mail fraud, and wire fraud, and false statement offenses inform our analysis.

[11] *But see United States v. Camick*, 796 F.3d 1206, 1214 (10th Cir. 2015) ("'The question of whether a statement is material is a question of fact for the jury to decide.'" (quoting *United States v. Sharp*, 749 F.3d 1267, 1279 (10th Cir. 2014)).

796 F.3d 1206, 1214-15 (10th Cir. 2015). The jury must then determine whether the relevant statement could influence the relevant decision. *Camick*, 796 F.3d at 1215.

Second, we analyze whether the statement was capable of influencing the relevant decision. *Irvin*, 682 F.3d at 1267. Because the Supreme Court's materiality definition in *Neder*, 527 U.S. at 16, "refer[s] to natural tendencies and capabilities, [it] establishes materiality in the bank fraud context as an objective quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision." *Irvin*, 682 F.3d at 1267. Materiality therefore does not turn on whether the misrepresentation actually influenced the bank or whether the decision maker actually relied on the misrepresentation; the "pertinent inquiry is instead whether [the defendant's] representations had the *capability* to so influence the[] decision[]." *Id.* at 1268.[12]

The Third Circuit has explained that "the relevant inquiry [is] whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *United States v. McBane*, 433 F.3d 344, 351 (3d Cir. 2005). The phrase "'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself." *Id.* Stated another way, the objective materiality test focuses on

---

[12] But this test is "unquestionably satisfied when, as here, the defendant's falsehoods *did in fact* influence agency action. Actually influencing an agency to act is proof positive that a statement is capable of influencing an agency to act." *United States v. Garcia-Ochoa*, 607 F.3d 371, 378 (4th Cir. 2010).

"the intrinsic capabilities of the statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances." *Id.* at 352.[13]

b. *Tenth Circuit Precedent*

Two Tenth Circuit cases figure prominently in our analysis.

i.  United States v. Camick

In *Camick*, 796 F.3d 1206, Mr. Camick used his brother's name and identity to file a provisional patent application with the U.S. Patent and Trademark Office ("PTO"). *Id.* at 1210-11. For this he was prosecuted and convicted of wire fraud, making a material false statement, and aggravated identity theft. *Id.* at 1212-13. We reversed his wire fraud and false statement convictions for lack of materiality, holding Mr. Camick's statements on the provisional patent application were not capable of influencing the PTO's decision to grant a patent. *Id.* at 1218-19.[14]

Based on the law governing provisional patent applications, we determined that the preliminary application did not require an oath or declaration, would not be examined for patentability, and would be deemed abandoned if the applicant took no

---

[13] *See also United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017) ("A false statement is material if it objectively had a tendency to influence, or was capable of influencing, a lender to approve a loan. This standard is not concerned with a statement's subjective effect on the victim, but only 'the intrinsic capabilities of the false statement itself.' For this reason, we have previously held that 'misrepresentation may be material without inducing any actual reliance.'" (citations omitted)).

[14] We also reversed Mr. Camick's related conviction for aggravated identity theft because it was predicated on his wire fraud and material false statement felonies. *Camick*, 796 F.3d 1219.

action within a year. *Id.* at 1218. Within one year, the applicant could convert the provisional to a nonprovisional application or incorporate it into one by reference. *Id.* at 1218-19. Thus "statements in a provisional patent application, without additional action on the part of the applicant, cannot influence the decision of the decisionmaking body to which it was addressed." *Id.* at 1219 (alterations and quotations omitted.) When the provisional application is filed, there is no decision to be made. *Id.* Even though the provisional application could later inform the PTO's decision if the applicant took additional action, the applicant could abandon the process through inactivity. *Id.* Because statements in the provisional application are incapable of influencing a PTO decision and because Mr. Camick abandoned his application, we held his false statements on the preliminary application were immaterial. *Id.* The PTO had no reason or opportunity to review the preliminary application, so it could not have influenced any patent decision. *Id.*

### ii. United States v. Irvin

In *Irvin*, 682 F.3d 1254, Ms. Irvin was part of a conspiracy to inflate the creditworthiness of potential home buyers. *Id.* at 1259-60. She also inflated her own credentials to obtain a mortgage loan, which she co-signed with a co-conspirator. *Id.* at 1267. At her trial for bank fraud, the bank said Ms. Irvin's fraudulent financial information had "no impact on the ultimate issuance of the loan," explaining that its "successful dealings with [her co-conspirator] provided the sole basis of decision to recommend issuance of the mortgage loan." *Id.* "[Ms.] Irvin's credit information was not even included in [the loan officer's] presentation to the loan committee." *Id.* Despite

- 16 -

this testimony from the bank, we affirmed her conviction on appeal, holding that whether her fraudulent representations actually influenced the bank did not matter because the representations still had the capability to influence the bank's decisions. *Id.* at 1268. We explained:

> [The bank's loan officer]'s requirement that Irvin submit her financial information as part of the loan application process, for example, indicates the information was at least potentially relevant to the bank's decision, and [her] decision to falsify the requested information indicates [she] believed it to be so. Furthermore, [the loan officer] testified it would have been relevant to the bank's decision to know that Irvin had submitted fraudulent tax returns . . . . [T]hose facts, combined with testimony presented . . . describing the significance of a loan applicant's financial information, could lead a rational trier of facts to conclude Irvin's representations to [the bank] were material.

*Id.* at 1268. In short, Ms. Irvin's misrepresentations were material because they *could have* influenced the bank's decision.

2. **Analysis**

a. *Threshold questions*

To determine whether Mr. Williams's misrepresentations were material, we follow the *Gaudin* framework, 515 U.S. at 512, and identify, based on the trial evidence: (1) the false statements Mr. Williams made, and (2) the decision the bank was trying to make.

First, Mr. Williams made several false statements. On July 25, 2014, he provided the bank with false information about his name, date of birth, social security number, and VA loan eligibility. The bank ran a credit report based on this false information, and

- 17 -

entered the resulting information onto his application.  On August 19, 2014, he provided

the bank with false income and asset information.

Second, the bank needed to decide whether to provide a loan to Mr. Williams.

b.  *Materiality*

Based on the foregoing, we address whether Mr. Williams's misrepresentations

had the "capability" or "natural tendency" to influence a reasonable bank's decision of

whether to provide a loan.  *Irvin*, 682 F.3d at 1267-68; *McBane*, 433 F.3d 350-51.  A

rational jury could conclude that Mr. Williams's misrepresentations were material beyond

a reasonable doubt.

First, a rational jury could conclude that the misrepresentations on the loan

application could influence the bank's decision to issue a loan:

- Ms. Mentzel testified Mr. Williams gave her permission to run his credit report based on the false information he had provided her.   The assets and liabilities entered on his loan application came from that credit report, reflecting his creditworthiness for a potential loan.  ROA, Vol. 2 at 127-28.

- The application explained that the bank would rely on the information provided.  By electronically signing the application, Mr. Williams agreed and acknowledged that "all statements made in this application are made for the purpose of obtaining a residential mortgage loan" and "[t]he lender . . . may continuously rely on the information contained in the application . . . ."  Supp. ROA at 40.  Ms. Mentzel also testified that "We have to [continue to] rely on information that's given to make a decision on if someone can purchase a home."  ROA, Vol. 2 at 130.

- The application warned that criminal penalties could result from misrepresentations.  By electronically signing the application, Mr. Williams also agreed and acknowledged that "the information provided in this application is true and correct . . . and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability . . . and/or in criminal penalties."  Supp. ROA at 40;

ROA, Vol. 2 at 130; *see also id.* at 167.

- The loan application packet contained another document titled "MORTGAGE FRAUD IS INVESTIGATED BY THE FBI," explaining that "[i]t is illegal for a person to make any false statement regarding income, assets, debt, or matters of identification . . . in a loan and credit application for the purpose of influencing in any way the action of a financial institution." Supp. ROA at 115. This document listed bank fraud under § 1344 as a potentially applicable federal criminal statute and required a signature by the applicant. *Id.*[15]

- Mr. Williams provided, among other things, a false name, false social security number, false employment verification, and false salary and income information. ROA, Vol. 2 at 81-90, 96-97; Supp. ROA at 36-42. Ms. Atkinson testified that the "[u]nderwriting [group] looks at things like credit history, income, employment history, debts, assets, and the value of property to decide whether a loan should be approved[.]" ROA, Vol. 2 at 216.[16]

Second, a rational jury could conclude that Mr. Williams's misrepresentations were capable of influencing the type of loan Mr. Williams could receive and the amount he would be eligible to borrow:

- Mr. Williams falsely represented to Ms. Mentzel he was eligible for a VA loan and was exempt from paying the typical funding fee for a VA loan because he had received a Purple Heart and was on VA disability. ROA, Vol. 2 at 133.

---

[15] Even if Mr. Williams did not sign this warning document, he signed and returned another document in the application packet. ROA, Vol. 2 at 308-09; *id.* at 331. Drawing inferences in the light most favorable to the government, *United States v. Los Dahda*, 853 F.3d 1101, 1106 (10th Cir. 2017), *petition for cert. filed*, (July 7, 2017) (No. 17-43), a rational jury could conclude Mr. Williams saw the warning document.

[16] Ms. Mentzel testified that "[r]ight before closing, we have to do another soft credit pulled on their credit report." ROA, Vol. 2 at 173.

- Based on that representation, Ms. Mentzel "pulled his certificate of eligibility" for a VA loan application and began to process a VA loan rather than an ordinary mortgage loan. *Id*.

- The bank submitted the credit report to the VA to obtain a "certificate of commitment to guarantee the subject loan." Supp. ROA at 43 (Government Exhibit 6).

- Ms. Mentzel asked the underwriter to calculate the maximum loan Mr. Williams would be eligible to receive based on Mr. Williams's misrepresentations and his VA certificate of eligibility showing he was eligible for a VA loan and exempt from the funding fee. ROA, Vol. 2 at 136-37. Ms. Mentzel testified that "after the loan application was taken," she "talked to [her] underwriter" to find out that the maximum for Mr. Williams's loan would be $423,750. *Id.* at 122.

- Ms. Mentzel testified that the VA loan without the funding fee was "definitely a better loan" for the borrower than other types of loans. ROA, Vol. 2 at 133.

Third, our case law supports the jury's finding that Mr. Williams's

misrepresentations were material. In *United States v. Moser*, 466 F. App'x 713 (10th Cir.

2012) (unpublished),[17] we held that misrepresentations on attachments to a loan

application were material. We explained that an application's showing that a "borrower

could guarantee a reliable stream of . . . income . . . was at least capable of influencing a

bank's loan decision." *Id.* at 716. Similarly, in *United States v. Rackley*, 986 F.2d 1357

(10th Cir. 1993), we found material the defendant's misrepresentation about his personal

financial interest in a loan. We explained that this misrepresentation was material

because the bank "would not have approved the loans or authorized the payments at

---

[17] Although not precedential, we find the reasoning of the unpublished cases cited in this opinion to be instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

closing had the loan documents accurately reflected defendant's interest in the loans." *Id.* at 1362. And in *Irvin*, we reasoned that the existence of a bank's requirement that the borrower submit financial information "indicate[d] the information was at least potentially relevant to the bank's decision, and [the defendant's] decision to falsify the requested information indicate[d] [that the defendant] believed" the information could influence the bank's decision. 682 F.3d at 1268. Mr. Williams's misrepresentations included a false stream of income. From the trial testimony, a rational jury could find that Mr. Williams was unable to afford the down payment on the home or to repay the loan. ROA, Vol. 2 at 319 (explaining that Mr. Williams stated the $70,000 down payment "was way over his head"); *id.* at 281-83 (explaining that Mr. Williams was "living in his car" when seeking the home loan and "had also filed and was going through a bankruptcy," claiming to have $303 "at the end of every month"). The bank would have denied him a loan had it known his true identity and financial state. Under the foregoing cases, his misrepresentations were capable of influencing the bank's decision.

c. *Mr. Williams's arguments*

Mr. Williams's arguments that his misrepresentations were not material are unavailing.

First, relying on *Camick*, he contends that, because he never completed the loan application and failed to date it, submit the required disclosures, submit a photo ID, or submit other supporting documentation, his misrepresentations were incapable of influencing the bank's loan decision. This argument fails factually and legally.

Mr. Williams assumes the bank never considers an incomplete application, but the evidence showed the bank sometimes does consider incomplete applications:

- Ms. Mentzel testified that the failure to date an application does not preclude the bank's consideration of that application. She said, "Well, [applicants are] supposed to date it but we do have people who don't date it. We don't not accept it if it's not dated . . . Well, I mean, they're supposed to date it. . . No, we're not going to not accept this application 'cause it's not dated." ROA, Vol. 2 at 162-63.

- Ms. Atkinson testified that the processing group "may or . . . may not" still send a file to the underwriting group even if the processing group does not obtain all the required documents. ROA, Vol. 2 at 210. She stated that whether the underwriter will review the application "depends on how much documentation they have, and if they have enough that—underwriting has enough information to give a rendering or an—you know, like a preliminary approval, or if we have—[enough] . . . items to make a decision." *Id.* "It's possible to forward [the loan application] with some notation in the file, still waiting on X, Y, or Z." *Id.* at 212.

*Camick* is distinguishable. In *Camick*, the provisional patent application was incapable of influencing the PTO's decision to issue a patent without additional action by the applicant. 796 F.3d at 1218-19.[18] Even if fully completed, the PTO specified that provisional applications "[would] not be examined for patentability" unless and until the applicant took some further action to incorporate the provisional application into a final,

---

[18] *See also United States v. Rigas*, 490 F.3d 208, 234-36 (2d Cir. 2007) (finding some misrepresentations to be immaterial because they were only relevant to decisions the bank lacked authority to make); *United States v. Litvak*, 808 F.3d 160, 172-74 (2d Cir. 2015) (finding misrepresentations to the Treasury were immaterial because the Treasury did not have authority to make the relevant decisions that the misrepresentations were intended to influence).

nonprovisional application. *Id.* at 1218-19.[19]  If the applicant did not take further action

within a year, the preliminary application would be deemed abandoned. *Id.*  Moreover,

even if the applicant incorporated the provisional application into a final, nonprovisional

application, the provisional application would serve only as a placeholder for the date of

its filing; the PTO's ultimate decision on whether to issue a patent would be based on the

nonprovisional application. *Id.* at 1219.[20]

In contrast to the provisional application in *Camick*, Mr. Williams's loan

application stated:  "All statements made in this application are made for the purpose of

obtaining a residential mortgage loan . . . .  The lender . . . may continuously rely on the

information contained in the application."  Supp. ROA at 40.  And, as Ms. Atkinson

testified, an application may be sent to the underwriting group for a loan approval

---

[19] The PTO specifies that "(C) Provisional applications will not be examined for patentability."  U.S. Patent & Trademark Office, Manual of Patent Examining Procedure § 201.04 (9th ed. 2014); *Camick*, 796 F.3d at 1218 (citing PTO Manual of Patent Examining Procedure).  It "cautions" that "[p]rovisional applications are not examined on their merits," and "[a] provisional application cannot result in a U.S. patent unless" a corresponding nonprovisional application for patent is filed or a petition to convert the provisional application into a nonprovisional application is filed.  Provisional Application for Patent, U.S. Patent & Trademark Office, *available at* https://perma.cc/3QAF-NKRA.  It also "warn[s]" that "[i]ndependent investors should fully understand that a provisional application will not mature into a granted patent without further submissions by the inventor."  *Id.*

[20] *See* Nonprovisional (Utility) Patent Application Filing Guide, U.S. Patent & Trademark Office, *available at* https://perma.cc/5BLL-Z9NV ("An applicant who decides to initially file a provisional application must file a corresponding nonprovisional application during the 12-month pendency period of the provisional application in order to benefit from the earlier provisional application filing.  A nonprovisional application is examined by a patent examiner and may be issued as a patent if all the requirements for patentability are met.").

decision even without all required documentation. ROA, Vol. 2 at 210, 212. Thus, unlike *Camick*, Mr. Williams's misrepresentations were capable of influencing the bank's loan decision and were made on the same application that the bank would consider in deciding whether to approve the loan.

Second, Mr. Williams argues that an underwriter never considered his incomplete application because it did not advance beyond the loan officer's assistant. This argument fails because a statement can be objectively material even if the decision maker did not consider it. *See e.g.*, *United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993) ("The statement may still be material 'even if it is ignored or never read by the agency receiving the misstatement.'"); *United States v. Diaz*, 690 F.2d 1352, 1357-58 (11th Cir. 1982) (same); *United States v. McIntosh*, 655 F.2d 80, 83 (5th Cir. 1981).

Third, Mr. Williams argues the Government has cited no bank fraud conviction in which a defendant's misrepresentations never reached the bank's decision maker or the defendant never obtained money from the bank. But our precedent holds that a decision maker's actual reliance on the misrepresentation is not required for a statement to be material. *Irvin*, 682 F.3d at 1267. It is irrelevant that the statement did not in fact reach the decision maker so long as the misrepresentation was objectively capable of influencing the decision. Additionally, as we explain below, "the Government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential risk by the scheme to defraud." *Young*, 952 F.2d at 1257. Finally, the statute includes the words "attempts to execute." 18 U.S.C. § 1344. Requiring the government to establish actual reliance to satisfy materiality or actual loss to show risk of loss would undermine

- 24 -

the statute's criminalization of "attempts to execute" the fraudulent scheme. 18 U.S.C.
§ 1344.

Fourth, Mr. Williams argues the bank already knew "early in the process" the application contained misrepresentations and had determined it would not approve the loan. Aplt. Br. at 31. This argument overlooks Ms. Atkinson's testimony that bank officials told her to "just proceed on the loan." ROA, Vol. 2 at 194-95.[21] Even under Mr. Williams's version of the facts, an early decision to deny him a loan shows his misrepresentations influenced the bank. As a legal matter, materiality turns on the nature of the misrepresentation: whether it was capable of influencing the bank's loan decision. It does not turn on whether the decision maker actually relied on the misrepresentation. *Irvin*, 682 F.3d at 1267; *see also McBane*, 433 F.3d at 351-52 (finding misrepresentation to FBI was material even when FBI's investigation was essentially complete and FBI conceded the statement had no effect on its case because it was still "of a type" capable of influencing a reasonable decision maker).

\*   \*   \*   \*

From the evidence at trial, a rational jury could find that Mr. Williams's misrepresentations were material beyond a reasonable doubt.

---

[21] Ms. DeRousse also testified she planned to continue working with Mr. Williams to obtain the documents needed to investigate further. She testified that "In this case, I [was] still looking at this as a person who might be a potential customer. There's no concrete evidence that a fraud has been committed. It could still be, in my mind, an error, so I don't want to contact people and start interrogating them." ROA, Vol. 2 at 228.

C. *Risk of Loss*

1. **Legal Background**

To satisfy the first element of bank fraud under § 1344(1)—"that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution"—our case law states that the government must show, in addition to materiality, that the financial institution was put at "risk," "potential risk," or suffered a "risk of loss." *United States v. Bowling*, 619 F.3d 1175, 1181 (10th Cir. 2010); *Swanson*, 360 F.3d at 1161 (citing *Akers*, 215 F.3d at 1101; *United States v. Sapp*, 53 F.3d 1100, 1102-03 (10th Cir. 1995); *Young*, 952 F.2d at 1257).[22] The government need not prove "a substantial likelihood of risk of loss" to support a bank fraud conviction; proving a potential risk is sufficient. *See United States v.*

---

[22] As the Government pointed out in a Rule 28(j) letter, some of our sibling circuits do not read § 1344 to require proof of risk of loss. Fed. R. App. P. 28(j) Supplemental Authority (May 24, 2017). *See United States v. Goodale*, 530 F. App'x 338, 341 (5th Cir. 2013) (unpublished) (citing *United States v. Warshak*, 631 F.3d 266, 313 (6th Cir. 2010); *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001); *United States v. De La Mata*, 266 F.3d 1275, 1298 (11th Cir. 2001)); *see also United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999) ("We believe that 'risk of loss' is merely one way of establishing intent to defraud in bank fraud cases."). Although the phrase does not appear in § 1344, in this circuit the government must show "risk of loss" to sustain a bank fraud conviction. *See United States v. Akers*, 215 F.3d 1089, 1101 (10th Cir. 2000); *United States v. Sapp*, 53 F.3d 1100, 1102-03 (10th Cir. 1995); *Young*, 952 F.2d at 1257. We are bound by the precedent of this circuit's prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court. *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015).

*McCauley*, 253 F.3d 815, 820 (5th Cir. 2001). Risk of loss is a question of fact for the jury.[23]

"To support a § 1344 conviction [for bank fraud,] the Government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential risk by the scheme to defraud." *Young*, 952 F.2d at 1257; *see also United States v. Mullins*, 613 F.3d 1273, 1279 (10th Cir. 2010) ("[A] potential risk of loss is enough to prove a scheme to defraud a financial institution.").[24] Section 1344 prohibits devising and executing, or intending and attempting to execute, a scheme to defraud, and the ultimate success or failure of the scheme does not determine criminal liability. *United States v. Kelley*, 929 F.2d 582, 585 (10th Cir. 1991); *see also* 18 U.S.C. § 1344 (criminalizing "attempts to execute, a scheme or artifice . . . to

---

[23] *See United States v. Reaume*, 338 F.3d 577, 583 (6th Cir. 2003) (treating risk of loss as a way to prove intent and holding that "whether [the defendant] actually harbored such intent is a question of fact for the jury to decide"); *Goodale*, 530 F. App'x at 342 (reviewing the district court's risk of loss finding as a finding of fact); *United States v. Nelson*, 242 F. App'x 164, 173 (5th Cir. 2007) (unpublished) ("On this evidence, a reasonable trier of fact could have found that [the defendant] knowingly subjected [the bank] . . . to a risk of loss."); *United States v. Rudaj*, No. 04-CR-1110, 2006 WL 1876664, at *7 (S.D.N.Y. July 5, 2006) ("The issues of materiality and whether [the defendant] intended to expose the bank to risk of loss are questions of fact . . . .").

[24] *See also United States v. Thomas*, 315 F.3d 190, 201 (3d Cir. 2002) ("[The legislature intended] that the [bank fraud] statute would proscribe conduct which undermines the integrity of federal insured institutions. The reputation and integrity of banking are harmed when a bank is victimized in a way that exposes it to liability. Conduct which exposes a bank to liability casts the institution of banking into doubt by adversely affecting its image with the public. It implicates the federal interest in maintaining the integrity and esteem of our federally insured banks."), *vacated on other grounds by Loughrin v. United States,* 134 S. Ct. 2384 (2014).

defraud a financial institution").  Thus, requiring that the bank suffer an actual loss

would conflict with the statute.  *Kelley*, 929 F.2d at 585.

A defendant's conduct can expose the bank to risk of loss just by "expos[ing]

the bank to civil litigation," even if that liability is not realized.  *Young*, 952 F.2d at

1257; *see also United States v. Lemons*, 941 F.2d 309, 316 (5th Cir. 1991) ("Although

the banks did not suffer harm [from accepting the defendant's forged check

endorsement], because [the account owner] did not challenge the endorsement, they

were at risk.").

"[T]here is only a small subset of cases where a defendant would intend to

defraud a bank and yet the bank would never be at any risk—i.e., incompetent

attempts."  *United States v. Loughrin*, 710 F.3d 1111, 1116 (10th Cir. 2013).[25]

1. **Analysis**

The uncontested jury instruction on risk of loss stated the Government must prove

beyond a reasonable doubt that "the defendant placed Pulaski Bank at risk of civil

liability or financial loss."  ROA, Vol. 1 at 106.  Based on the trial evidence viewed in the

light most favorable to the Government, a rational jury could have found that Mr.

---

[25] Cases finding no risk of loss include:  *United States v. Rodriguez*, 140 F.3d 163, 169 (2d Cir. 1998) (finding no risk of loss when a bank takes a check only as a holder in due course, which "preclude[s] the potential that the bank could be victimized by a loss" because the bank takes the check free of any claims or defenses that the signatory may have or choose to institute against the bank); *United States v. Khorozian*, 333 F.3d 498, 505-06 (3d Cir. 2003) (collecting cases finding no risk of loss because "those cases involved fraud on a third party where the bank was merely an 'unwitting instrumentality' in the fraud rather than the 'target of deception'").

Williams exposed the bank to "a potential risk of loss," *Mullins*, 613 F.3d at 1279, due to his July 25 and August 19 misrepresentations.

  a. *July 25 misrepresentations*

The trial evidence showed Mr. Williams's misrepresentations on July 25, 2014 about his creditworthiness and VA loan eligibility exposed the bank to a risk of loss. As explained above:

- Mr. Williams gave Ms. Mentzel permission to run his credit report based on the false information he had provided, and information from that credit report was entered on his loan application. ROA, Vol. 2 at 127-28.

- Mr. Williams provided, among other things, a false name, false social security number, false employment verification, and false salary and income information. *Id.* at 81-90, 96-97; Supp. ROA at 36-42. Ms. Atkinson testified that the underwriting group looks at that information to decide whether to approve a loan. ROA, Vol. 2 at 216.

- Mr. Williams falsely represented to Ms. Mentzel he was eligible for a VA loan and was exempt from paying a funding fee because he had received a Purple Heart and was on VA disability. *Id.* at 133. Ms. Mentzel obtained his certificate of eligibility for a VA loan application and began to process a VA loan rather than an ordinary mortgage loan. *Id.*[26] Based on this information, Ms. Mentzel testified that her underwriter said the maximum for Mr. Williams's loan would be $423,750. *Id.* at 122.

Viewed in the light most favorable to the government, the evidence showed the credit report used to establish Mr. Williams's loan eligibility was based on Earl

[26] On the VA "Addendum to Uniform Residential Loan Application," which is required to obtain a VA loan, the bank "ma[de] the following certifications to induce the Department of Veterans Affairs to issue a certificate of commitment to guarantee the subject loan": "A. The loan terms furnished in the Uniform Residential Loan Application and this Addendum are true, accurate and complete," and "B. The information contained in the Uniform Residential Loan Application and this Addendum was obtained directly from the borrower . . . and is true to the best of the lender's knowledge and belief." Supp. ROA at 43.

Williams's credit, which was superior to Mr. Williams's. Bank employees testified that incomplete applications may be passed on to an underwriter. The misrepresentations about Mr. Williams's creditworthiness and VA loan eligibility tended to show that Mr. Williams exposed the bank to a risk that it might loan him more money than he could afford to repay.

b. *August 19 misrepresentations*

The bank also faced risk when Mr. Williams continued to pursue the loan by submitting additional documents on August 19, 2014. The evidence showed:

- After learning about the call from Earl Williams, Ms. DeRousse directed bank employees to continue working with Mr. Williams to obtain the documents needed to investigate further. *Id.* at 228. She testified, "In this case, I'm still looking at this as a person who might be a potential customer. There's no concrete evidence that a fraud has been committed. It could still be, in my mind, an error, so I don't want to contact people and start interrogating them." *Id.* at 227-28.

- Mr. Williams told Ms. Mentzel that he would bring in the requested documents and photo ID. *Id.* at 141. To explain his delay, he told her "[t]hat he was working on it, or that he had requested information, or like one time, [another] bank was supposed to be sending us the bank statements and items that we needed." *Id.* at 142.

- Ms. DeRousse testified that she contacted federal authorities about Mr. Williams's application "relatively early on in the investigation," but that she would investigate further if the bank received more documentation. *Id.* 230-31. She stated that, after Earl Williams's call, she "didn't have sufficient information to clearly determine whether truly there was an identity theft in progress . . . [and she,] at that point, because [the bank] didn't have the proper identification to proceed with the loan, didn't feel that the bank was at a risk for a loss, so [she] was not going to do anything further to try to investigate." *Id.* at 230-31. She continued, "Unless [the bank] did at some point receive the documentation [it] needed to proceed with the application, [she] didn't see a need to investigate further." *Id.* at 231; *see also id.* at 241 (testifying that she was satisfied the bank was not at a risk of loss "[u]nless the proper documentation, the identification was

obtained").

- Ms. DeRousse testified that, although she referred the investigation to law enforcement, the bank could still face a future risk of loss. She said she generally turns investigations over to law enforcement if she "[d]etermine[s] that . . . at that point, there's no risk for loss." *Id.* at 245. But she clarified that "[t]here could still be risk of loss, future loss." *Id.* at 246. She would then take steps to ensure that a future risk of loss did not occur by, for example, monitoring a loan application. *Id.* at 246.

- Ms. DeRousse testified that she would continue her investigation if more documents were received from Mr. Williams. She requested that the mortgage department inform her "if they did obtain that [photo] identification and were going to proceed with the loan . . . because at that point, [she] would have wanted to further [her] investigation just to assure that there would be no loss to the bank." *Id.* at 237.

- On August 19, 2014, Mr. Williams sent additional documents to the bank, including a signed form titled "INTENT TO PROCEED WITH LOAN APPLICATION" to express his "intent to proceed with this [loan] application," and a pay stub showing at least monthly net wages of $3,275.25. Supp. ROA at 105; ROA, Vol. 2 at 135, 308-09; *id.* at 331. Ms. DeRousse testified that this was the sort of "trickling in of documents," that "would lead you to believe that maybe there was just some kind of an error. He's continuing to provide the documents being asked for except for the driver's license." *Id.* at 232-33.

Viewed in the light most favorable to the government, this second grouping of evidence also was probative of risk of loss. Even if Ms. DeRousse's testimony that she "didn't feel that the bank was at a risk for a loss," *id.* at 230-31, could suggest the bank's risk had subsided when she contacted law enforcement, the risk resumed when Mr. Williams provided further documentation on August 19 and persisted until the bank closed his file. Ms. DeRousse testified that the bank could still be at a future risk of loss if Mr. Williams provided further documentation. He did so on August 19, including a

fraudulent earnings statement and the form on which he expressed his intent to proceed with the loan.

    c. *Totality of the evidence*

A rational jury could find the bank was at risk (1) after Mr. Williams called the bank on July 25 and repeatedly misrepresented himself to Ms. Mentzel in ways that prompted the bank to obtain a credit report and a VA loan certificate, and (2) after Mr. Williams provided further documentation on August 19. We need not determine whether the July 25 and August 19 misrepresentations were independently sufficient to find risk of loss. The totality of the trial evidence was sufficient for a rational jury to find a potential risk of loss beyond a reasonable doubt.

    d. *Mr. Williams's arguments*

Mr. Williams's three arguments fail.

First, he relies on Ms. DeRousse's testimony that she determined "very early in the process" that the bank was not at a risk of loss. Aplt. Br. at 31. But Mr. Williams has taken Ms. DeRousse's statement out of context. *United States v. Gallant*, 537 F.3d 1202, 1222-23 (10th Cir. 2008) ("Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." (quotations omitted)). Even if Ms. DeRousse's statement meant the bank's risk had abated, she testified that "[t]here could still be risk of loss, future loss" if more documentation was received. ROA, Vol. 2 at 246. Mr. Williams then assured the bank he would provide the required information, sent the letter

indicating his intent to proceed with the loan, and provided additional documentation—

together exposing the bank to the risk Ms. DeRousse described.

Second, Mr. Williams reiterates that his loan application was incomplete and

argues his efforts were an "incompetent attempt" that did not put the bank at a risk of

loss. Aplt. Br. at 40. But as explained above, the bank employees' testimony shows that

even an incomplete loan application may be sent to the underwriting department. *See*

*United States v. Morganfield*, 501 F.3d 453, 465-66 (5th Cir. 2007) (finding bank had

risk of loss when it was presented with a check from an account with insufficient funds

because testimony showed the bank might honor the check even when an account had

insufficient funds and "[t]hat possibility create[d] a sufficient risk of loss").

Additionally, a rational jury could find Mr. Williams's misrepresentations were

not "incompetent." When analyzing risk of loss, the question is whether the executed or

attempted scheme to defraud would objectively expose the bank to a risk of loss. *See*

*United States v. Adekoya*, 60 F. Supp. 3d 294, 300 (D.N.H. 2015) ("[A] bank fraud

conviction requires proof of a scheme—whether or not it is actually capable of success—

that would, if realized, victimize a bank . . . or put it at risk of loss." (emphasis omitted)),

*appeal filed*, (Mar. 13, 2015) (No. 15-1304). As with materiality, the factfinder must

look to the nature of the misrepresentation and determine whether that misrepresentation

would expose a bank to a potential risk of loss.[27] This approach is consistent with the

---

[27] *See United States v. Jacobs*, 117 F.3d 82, 93 (2d Cir. 1997) ("Jacobs may
have intended to defraud [only] his customers by inducing them to purchase certified
drafts which he knew were not 'worth the paper they're printed on,' but *inherent* in

Continued . . .

statute's criminalization of "attempts to execute" a scheme to defraud, § 1344, and our precedent that the bank need not suffer actual loss. *Young*, 952 F.2d at 1257.[28] Here, Mr. Williams's misrepresentations inflating his ability to repay a loan exposed the bank to a potential risk that the bank would approve a loan he would be unable to repay. *See Jacobs*, 117 F.3d at 93 ("But, for purposes of this statute, the risk can be said to have been increased in that there was some possibility—at least a potential—that the bank would release security, delay efforts at collection or otherwise act in reliance upon its receipt of the certified drafts."); *id.* ("Admittedly, the possibility of such actions in reliance may be rather remote since banks are cautious; but such actions are not impossible and, under the case law, a mere possibility of detrimental reliance is enough.").

Third, Mr. Williams argues that his August 19, 2014 misrepresentations did not put the bank at a risk of loss because the bank sent a second notice of incompleteness just three days later.[29] But Ms. Atkinson testified that the first notice of incompleteness gave

---

that transaction was the risk that the certified drafts would eventually be presented to the [bank] as payment, and acceptance of a false certified draft would expose the [] bank to real loss." (emphasis added)), *vacated on other grounds by Loughrin,* 134 S. Ct. 2384; *United States v. Stavroulakis*, 952 F.2d 686, 695 (2d Cir. 1992) ("*Inherent* in a [scheme for the] sale of stolen checks is that they will eventually be presented to the drawee bank for payment; and payment over a forged signature exposes the bank to real loss." (emphasis added)).

[28] Allowing an incomplete scheme to avoid liability would undermine the statute's criminalization of attempts to execute a fraudulent scheme. A "potential risk of loss" necessarily includes loss that has not and may not be realized.

[29] Even though the bank closed Mr. Williams's loan file for incompleteness and avoided actual monetary loss, we reiterate that "the Government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential

Continued . . .

Mr. Williams ten business days to provide more requested documents, which he did on August 19, and the second notice gave him five more business days. The notices thus provided Mr. Williams with an opportunity to remedy the incompleteness until the bank closed the file. The bank's risk of loss thus persisted until then.

*    *    *    *

From the evidence at trial, a reasonable jury could find that Mr. Williams's misrepresentations exposed the bank to a potential risk of loss beyond a reasonable doubt.

## III. **CONCLUSION**

For the foregoing reasons, we affirm Mr. Williams's bank fraud conviction. We also affirm his aggravated identity theft conviction because it rises and falls with the bank fraud conviction.

---

risk by the scheme to defraud." *Young*, 952 F.2d at 1257; *see also United States v. Hord*, 6 F.3d 276, 282 (5th Cir. 1993) (explaining that it is "[n]o matter that, in this case, the bank quickly discovered the scheme and avoided [actual] loss"). We look to whether the scheme exposed the bank to a potential risk of loss; not whether actual loss was incurred. *Young*, 952 F.2d at 1257. Here, the bank was exposed to a potential risk of loss by Mr. Williams's misrepresentations about his creditworthiness and VA loan eligibility. Mr. Williams's continued pursuit of the loan perpetuated the risk.