FILED
United States Court of Appeals
Tenth Circuit

September 30, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

JAMES ANTHONY SANDOVAL,

　　　　Defendant - Appellant.

No. 24-2107

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:22-CR-01010-JB-1)**
_____

Elizabeth Harrison (Paul J. Kennedy and Jeffrey D. Vescovi with her on the briefs), Kennedy, Hernandez & Harrison, P.C., Albuquerque, New Mexico, for Defendant-Appellant.

Kristopher N. Houghton, Assistant United States Attorney (Holland S. Kastrin, Acting United States Attorney, with him on the briefs), District of New Mexico, Albuquerque, New Mexico, for Plaintiff-Appellee.
_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

In this appeal, we address the validity of the defendant's convictions and sentence.

The convictions involved the taking of government property and the making of false statements. Underlying the convictions was the government's payment of disability benefits. But these benefits were subject to caps on "countable income." *See* 20 C.F.R. § 404.1575. These caps trigger issues as to the sufficiency of the evidence and the jury instructions.

In assessing the sufficiency of the evidence on guilt, we consider whether a factfinder could reasonably find countable income exceeding the caps based on evidence involving gross income, concealment of earnings, and failure to disclose business expenses in response to an administrative request. We answer *yes*.

We also consider whether the district court erred in failing to provide the jury with a definition of the term *income*. For this issue, however, the defendant waited too long to challenge the district court's reasoning.

Finally, we address challenges to the sentence. When a defendant is sentenced for a crime involving fraud, the district court must consider the amount of the loss. Can the district court calculate the loss to include reasonably foreseeable payments to (1) the defendant's children and (2) the defendant himself outside the charged period? We answer *yes*.

1.   **A recipient of disability insurance benefits earns income through a jewelry business.**

The defendant, Mr. James Sandoval, was diagnosed with chronic obstructive pulmonary disease in 2007 and began receiving disability insurance benefits the next year. The benefits included funds from disability insurance and payment of Medicare premiums.

While receiving these funds, Mr. Sandoval sold jewelry. The Social Security Administration investigated and asked Mr. Sandoval if he had worked or obtained an income since his diagnosis. Mr. Sandoval answered *no* to both questions.

If Mr. Sandoval had earned an income, the amount could affect his eligibility for benefits. Between 2017 and 2020, for example, he would qualify for the benefits only if his countable income fell below monthly regulatory caps ranging from $1,170 (for 2017) to $1,260 (for 2020). Appellant's App'x vol. 5, at 72–73. Given the regulatory caps, the Social Security Administration determined that Mr. Sandoval

- had knowingly provided false information and

- had been ineligible for benefits.

These determinations led

- the Social Security Administration to terminate Mr. Sandoval's benefits and

- the district court to convict him of knowingly taking property belonging to the government and making false statements.

18 U.S.C. § 641 (taking of property belonging to the government); 18 U.S.C. § 1001(a)(2) & 42 U.S.C. § 408(a)(3) (making of false statements). At sentencing, the district court considered the guidelines, which fixed the offense level based on the amount of the loss. U.S.S.G. § 2B1.1 (2021 ed.). The district court calculated the loss as $182,735.10, which triggered an offense level of 16 when the amount ranged between $150,000 and $250,000. U.S.S.G. § 2B1.1(b)(1)(F) (2021 ed.). Given the offense level of 16, the court imposed a 15-month prison sentence.

**2.    The evidence was sufficient to convict, and the district court didn't err in instructing the jury.**

Mr. Sandoval challenges the convictions, arguing that (1) the evidence of guilt was insufficient and (2) the district court should have instructed the jury on the meaning of the term *income*. We reject these arguments.

**a.    The evidence of guilt was sufficient.**

Mr. Sandoval was convicted on 35 counts. All but 2 of these counts involved the taking of government property from June 2017 to February 2020. The remaining 2 counts involved the making of false statements.

At trial, the government presented unrebutted evidence that (1) Mr. Sandoval's gross income had exceeded the regulatory caps and (2) he had denied receiving any income since 2007. But little information existed about Mr. Sandoval's expenses. Mr. Sandoval thus argues that the

4

government failed to prove that his countable income had exceeded the regulatory caps.

**Standard of review.** To determine whether the evidence was sufficient for the convictions, we conduct de novo review and consider the evidence in the light most favorable to the government. *United States v. Joseph*, 108 F.4th 1273, 1280 (10th Cir. 2024). With this view of the evidence, we determine whether any reasonable jury could have found guilt beyond a reasonable doubt. *Id.*

**Taking of government property.** For 33 of the counts, the government relied on evidence involving Mr. Sandoval's business. He sold jewelry through 2 stores and showings around the country. Evidence about the sales came from testimony by a former bookkeeper, agents conducting the investigation, a repeat customer, and a supplier. The testimony showed gross income exceeding the regulatory caps and efforts to conceal that income.

First, a former bookkeeper testified that (1) Mr. Sandoval's 2014 receipts had easily exceeded $150,000 to $200,000 per year, (2) he had sometimes earned "27, 47, 60-some thousand dollars" from a single jewelry show, Appellant's App'x vol. 4, at 37–38, (3) he had given instructions not to process cash sales, and (4) he had put $37,000 in sale proceeds into his mother's bank account and filed quarterly taxes through a business that didn't include the mother.

Second, three agents testified about their conversations with Mr. Sandoval, stating that he had admitted

- making and selling custom jewelry since 2004,

- starting his business in 2009,

- traveling from 2009 to 2018 to sell jewelry, including attending roughly 52 trade shows in 2018,

- selling jewelry in 15–16 states,

- driving several vehicles, and

- shipping jewelry all over the country.

Third, a repeat customer testified that the jewelry was "high-end" and that she had bought a 14-carat gold ring for over $1,000. Appellant's App'x vol. 5, at 148.

Fourth, a supplier testified that he had obtained thousands of dollars per month for jewelry sales to Mr. Sandoval.

The government supplemented the testimony with evidence about Mr. Sandoval's business accounts, which showed

- over $385,000 in credits from June 2017 to May 2018 and

- over $286,000 in credits from August 2018 to March 2019.

An analyst examined the accounts and testified that Mr. Sandoval had roughly $1.9 million in transactions from 2014 to 2019.

Mr. Sandoval doesn't deny evidence of gross income exceeding the regulatory caps. But he points out that the Social Security Administration

6

based eligibility on *countable income*, which was tied to *net* income (not *gross* income). *See* 20 C.F.R. § 404.1575(c)(1). So if Mr. Sandoval had earned $10,000 in one month and incurred expenses of $9,000, his countable income would have fallen below the regulatory caps. We thus consider whether Mr. Sandoval's expenses could have reduced his countable income below the regulatory caps.

The question doesn't require a blanket answer for every conceivable scenario because gray areas exist. For example, suppose that an attorney earns $1 million per year conducting mediations. If there's no evidence about the expenses, the jury could reasonably infer that they couldn't possibly skyrocket enough to trigger eligibility for disability benefits. But suppose the attorney earns $20,000 per year rather than $1 million. A jury might reasonably infer that the attorney's countable income would have fallen below the regulatory caps.

Which was the case here? To find out, an employee of the Social Security Administration testified that

- she had asked Mr. Sandoval for information that would have reduced his countable income and

- Mr. Sandoval didn't provide information supporting a reduction.

Appellant's App'x vol. 5, at 110. The Social Security Administration was thus left

- with evidence of gross income towering above the regulatory caps and

- without any information about expenses from the person who knew what they were and who had an incentive to disclose them.

The jury could reasonably infer that Mr. Sandoval would have disclosed those expenses if they would have dropped his net income below the regulatory caps.

Courts have considered a similar issue when addressing criminal convictions involving a failure to pay enough in income taxes. In these cases, the taxable amount involves deductions from gross income. *See* 26 U.S.C. § 63(a) (defining *taxable income* as "gross income minus the deductions allowed by [the Internal Revenue Code]"). But the deductible amounts may be known to the taxpayer and unknown to the government. So circuit courts have uniformly held that

- the government must present evidence of the amount coming in to the taxpayer and

- the taxpayer must present evidence of offsetting expenses.

*Siravo v. United States*, 377 F.2d 469, 473–74 (1st Cir. 1967); *United States v. Tarwater*, 308 F.3d 494, 507–09 (6th Cir. 2002); *United States v. Bender*, 218 F.2d 869, 871 (7th Cir. 1955); *United States v. Orlowski*, 808 F.2d 1283, 1288 (8th Cir. 1986).

These cases reflect the impracticality of requiring the government to quantify business expenses when the amounts are known to the defendant

8

and unknown to the government. *See Ala. Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 494 n.17 (2004) (stating that the burdens of production and persuasion may be placed on the party with superior access to information); *see also United States v. N.Y., New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n.5 (1957) ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.").

Because information about business expenses was available to Mr. Sandoval, the Social Security Administration asked him about these business expenses to determine whether they would have dropped his income below the regulatory caps. According to a witness from the agency, Mr. Sandoval provided no such information.

Without information about the expenses, we must determine whether the jury could reasonably find that Mr. Sandoval's countable income had exceeded the regulatory caps. We answer *yes* based on a combination of three categories of evidence.

First, the gross income greatly exceeded the regulatory caps on countable income. A government witness testified that roughly $1.9 million had passed through the business accounts over a five-year period. *See* p. 6, above. To retain eligibility for benefits, Mr. Sandoval would have needed gargantuan expenses.

Second, the jury could reasonably find that Mr. Sandoval had manipulated his business records to hide income. For example, a former bookkeeper testified that

- she had been instructed to disregard cash purchases and to record income in an account owned by Mr. Sandoval's mother and

- Mr. Sandoval had directed her to deposit proceeds from jewelry sales into his mother's bank account.

Appellant's App'x vol. 4, at 52–58, 91; *see* p. 5, above. From this testimony, the jury could reasonably infer that Mr. Sandoval had tried to conceal his ineligibility for benefits.

Third, a law-enforcement officer testified that Mr. Sandoval had boasted about the fruits of his hard work, gesturing toward his store and his car. Appellant's App'x vol. 6, at 73. The jury might infer from these gestures that Mr. Sandoval was reinvesting in his business. But the jury could also infer that Mr. Sandoval had been boasting about his wealth from the jewelry business.

Based on the three categories of evidence, a jury could reasonably find that Mr. Sandoval had countable income exceeding the regulatory caps from June 2017 to February 2020.

**Making of false statements.** Mr. Sandoval was also convicted of making false statements. In a 2020 interview, Mr. Sandoval said that he was not working and had no income. He repeated these statements the next

10

year in a written report. The government characterized these statements as false because Mr. Sandoval had been able to work and had obtained income from his jewelry business.

We can assume for the sake of argument that Mr. Sandoval hadn't misrepresented his work status. But even with this assumption, we would need to uphold the convictions if the evidence showed false denials of any income. *See United States v. Iverson*, 818 F.3d 1015, 1026 (10th Cir. 2016) (stating that we'll affirm if there was sufficient evidence on one means of committing a crime even if the evidence of other means had been insufficient).

In our view, a jury could reasonably find that Mr. Sandoval had earned at least some income. As noted above, Mr. Sandoval represented in 2020 and 2021 that he had no income. But as noted above, the government presented considerable evidence that Mr. Sandoval was earning hundreds of thousands of dollars through his two stores and his showings.

In the face of this evidence, Mr. Sandoval points out that his income tax returns showed no taxable income. But the jury didn't have to credit Mr. Sandoval's representations in his tax returns. *See United States v. Peister*, 631 F.2d 658, 663 (10th Cir. 1980) (stating that a jury could disbelieve a defendant's testimony in finding that he had willfully avoided taxes); *accord United States v. Freeman*, 147 F.4th 1, 35 (1st Cir. 2025)

(concluding that the jury had been "free to disbelieve" the taxpayer's explanation for the failure to pay taxes).

Mr. Sandoval also argues that the misstatements were immaterial, but we disagree for two reasons. First, the interview and form were designed to help the Social Security Administration assess a person's continued eligibility for benefits. Second, Mr. Sandoval was presumably denying any income in order to convince the Social Security Administration that he was eligible for benefits.

Rather than challenge these reasons, Mr. Sandoval points out that the Social Security Administration didn't believe his statements. But materiality is an objective test, focusing on whether the statement had a "natural tendency to influence, or [was] capable of influencing" the Social Security Administration. *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (quoting *United States v. Williams*, 865 F.3d 1302, 1310 (10th Cir. 2017)). Given the objectivity of the test, materiality doesn't turn on whether the Social Security Administration actually relied on the statements. *Williams*, 865 F.3d at 1310. So "[a] false statement can be material even if the agent to whom it is made knows that it is false." *United States v. Whitaker*, 848 F.2d 914, 916 (8th Cir. 1988); *United States v. LeMaster*, 54 F.3d 1224, 1230–31 (6th Cir. 1995) (quoting *Whitaker*, 848 F.2d at 916); *see United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir.

12

1999) ("[A] false statement can be material even if the decision maker actually knew or should have known that the statement was false.").

The evidence was thus sufficient for the jury to find the making of materially false statements in 2020 and 2021.

**b.    The court didn't commit reversible error when instructing the jury.**

At trial, Mr. Sandoval asked the district court to instruct the jury about the regulatory definition of *income* for purposes of eligibility for benefits. The district court declined, reasoning in part that

- the definition was better suited to closing argument, where Mr. Sandoval could use the regulations when addressing *countable income* and

- the proposed instruction would confuse the jury because the other instructions on the taking of government property didn't refer to the term *income*.

Appellant's App'x vol. 3, at 190–91. Mr. Sandoval argues that the district court should have defined the term *income* because it was central to the charges that he had taken government property.

We review this argument under the abuse-of-discretion standard. *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008). In applying this standard, we consider the arguments that Mr. Sandoval makes in his opening brief. There he focuses on the importance of the term *income*. But in his opening brief, he doesn't address the district court's

13

- reliance on the parties' opportunity to address the definition in closing argument or

- concern with confusion because of the failure to link the definition of the term *income* to another instruction on the counts involving the taking of government property.

Though Mr. Sandoval doesn't address these rationales in his opening brief, he does discuss them in his reply brief. But the reply brief was too late for Mr. Sandoval to challenge the district court's rationales. *See United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019).

Mr. Sandoval's argument not only comes too late but also fails to show an abuse of discretion. In closing, Mr. Sandoval was able to present the regulations defining *countable income* and to focus on the difference between this definition and gross income.

Granted, an instruction might carry greater weight than an attorney's statement in closing. But that weight could have confused the jury when it considered the two counts involving the making of false statements. In those counts, the government alleged that Mr. Sandoval had falsely answered questions about his *income*. But Mr. Sandoval doesn't suggest that these questions had used the term *income* to refer to *countable income*. Given the difference in use of the same term (*income*) for multiple counts, the district court could minimize confusion by declining to define the term and letting Mr. Sandoval use the regulatory definition in his closing argument.

14

We thus conclude that Mr. Sandoval hasn't shown an abuse of discretion in the jury instructions.

**3.    At sentencing, the district court didn't commit reversible error in calculating the *loss*.**

At sentencing, the district court needed to consider the pertinent guideline range. 18 U.S.C. § 3553(a)(4)(A). This range depended in part on the amount of the loss. U.S.S.G. § 2B1.1 (2021 ed.). The court calculated this amount as $182,735.10, which triggered an offense level of 16. *See* U.S.S.G. § 2B1.1(b)(1)(F) (2021 ed.) (loss from $150,000 to $250,000). Mr. Sandoval insists that the loss had been lower, arguing that the district court mistakenly included losses incurred before and after the charged period, losses resulting from benefits for two children, and losses relating to the government's payment of Medicare premiums.

**a.    Standard of Review**

The amount of the loss is a factual matter that we review for clear error. *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008). An error is *clear* only if "we have a 'definite and firm conviction that a mistake has been committed.'" *United States v. Hahn*, 551 F.3d 977, 979 (10th Cir. 2008) (quoting *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1221 (10th Cir. 2007)).

But when applying the clear-error standard to the amount of the loss, we also consider the legal standard for *relevant conduct*. U.S.S.G. § 1B1.3

15

(2021 ed.). Conduct is *relevant* if it was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (2021 ed.).

**b.    Losses outside the charged period**

To select an appropriate sentence, the district court had to consider the sentencing guidelines. 18 U.S.C. § 3553(a)(4). Under the guidelines, the starting point is the offense level. *See* U.S.S.G. § 1B1.1(a)(1)–(2) (2021 ed.). In cases involving fraud, the court must adjust the offense level based on the amount of the loss. *See* U.S.S.G. § 2B1.1(b)(1)(F) (2021 ed.). "Loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, com. 3(A) (2021 ed.); *see United States v. Wright*, 848 F.3d 1274, 1284 (10th Cir. 2017) ("In determining loss, the district court must use the greater of the actual loss or intended loss.").

The government relied on actual loss. *See* Appellant's App'x vol. 7, at 41 (stating that "$182,735.10 is actual loss that resulted from [Mr. Sandoval's] fraudulent conduct"). According to the government, the loss

- started before the charged period (March 2015 to May 2017) and

- ended after the charged period (March 2020 to June 2021).

The government bore the burden to prove these losses by a preponderance of the evidence. *United States v. Griffith*, 584 F.3d 1004, 1011–12 (10th

16

Cir. 2009). The district court found that the government had satisfied its burden.

**Losses before the charged period (March 2015 to May 2017).** For losses from March 2015 to May 2017, the government points to testimony by an employee of the Social Security Administration. The employee testified that the Administration had sent Mr. Sandoval a notice with a proposed decision, stating that his countable income from March 2015 to May 2017 had exceeded the monthly regulatory caps. Appellee's App'x vol. 1, at 109–16. The employee explained that the Administration had based the proposed decision on Mr. Sandoval's accounts and tax returns. Appellant's App'x vol. 5, at 85–87. The district court thus found that Mr. Sandoval had improperly accepted insurance benefits from March 2015 to May 2017. This finding wasn't clearly erroneous in light of the employee's testimony.

**Losses after the charged period (March 2020 to June 2021).** The charged period ended in February 2020, but the Social Security Administration continued paying Mr. Sandoval until June 2021. Appellant's App'x vol. 7, at 65–66. He argues that the district court shouldn't have included these payments because the government lacked any evidence about his income from March 2020 to June 2021. But this evidence wasn't required.

17

At trial, an employee of the Social Security Administration testified that the agency had told Mr. Sandoval that his eligibility for benefits had terminated in December 2017. Appellant's App'x vol. 5, at 86. Mr. Sandoval didn't respond with any information suggesting a mistake in the termination. *Id.* at 88–89.

With the termination of his eligibility, Mr. Sandoval would have needed to reapply for disability insurance benefits. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) (stating that a claimant needed to reapply when the Social Security Administration terminated benefits for engaging in substantial gainful activity). Though Mr. Sandoval didn't reapply, he continued receiving benefits. So the district court didn't err in including the payments from March 2020 to June 2021. *See United States v. Agrawal*, 97 F.4th 421, 437 (6th Cir. 2024) (stating that "if an ineligible disability-benefits applicant falsely claims to be unemployed (an eligibility requirement for some disability benefits), the loss will equal the full amount of benefits because the applicant should have 'obtained' nothing").

c.    **Benefits for Mr. Sandoval's children**

When parents obtain disability insurance benefits, minor dependents can obtain benefits while they're under 18 and unmarried. 20 C.F.R. § 404.350. After Mr. Sandoval started obtaining benefits, his ex-wife obtained $57,378 in benefits for their two children.

Mr. Sandoval argues that the district court shouldn't have included these payments because the ex-wife had acted alone when applying for the children. This argument rests on a misunderstanding of the district court's reason for including these payments in the *loss*.

The government had two potential theories for including these payments. First, the government could treat the payments as the result of joint criminal activity on the part of Mr. Sandoval and his ex-wife. U.S.S.G. § 1B1.3(a)(1)(B) (2021 ed.) (discussing "jointly undertaken criminal activity"). Second, the government could rely solely on Mr. Sandoval's own wrongdoing. U.S.S.G. § 2B1.1, com. 3(A)(i) (2021 ed.). For this approach, the government needed to show that Mr. Sandoval had known or should have foreseen that the government would pay additional benefits for the children. U.S.S.G. § 2B1.1, com. 3(A)(i), (iii)–(iv) (2021 ed.). But Mr. Sandoval didn't properly challenge foreseeability either in district court or on appeal.

In district court, Mr. Sandoval objected to the presentence report on the ground that the ex-wife hadn't committed a crime when applying for the benefits. Appellant's App'x vol. 7, at 28. This argument would apply only if the government had attributed the payments to joint criminal activity on the part of Mr. Sandoval and his ex-wife. Rather than take this approach, however, the government treated the payments as the result of Mr. Sandoval's own conduct. This approach turned on foreseeability, which

19

went unaddressed in Mr. Sandoval's objections to the presentence report. By failing to challenge foreseeability of the payments, Mr. Sandoval forfeited his current appellate argument. *United States v. Dwyer*, 245 F.3d 1168, 1170 (10th Cir. 2001).[1]

Even if Mr. Sandoval had preserved the argument, however, he would have waived it on appeal. Mr. Sandoval needed to make this argument in his opening brief. *Mesa v. White*, 197 F.3d 1041, 1044 n.3 (10th Cir. 1999). But he didn't. He waited until his reply brief to challenge the foreseeability of the payments. The reply brief was too late for Mr. Sandoval to challenge foreseeability of the payments. *United States v. Fernandez-Barron*, 950 F.3d 655, 663 (10th Cir. 2019).[2]

The district court included the payments in the *loss* as the foreseeable consequence of Mr. Sandoval's conduct, not as the result of joint criminal activity with the ex-wife. The court's approach rested on foreseeability of the payments, and Mr. Sandoval failed to preserve this challenge either in his objections to the presentence report or in his

---

[1]    The argument could be reviewable anyway if Mr. Sandoval had urged plain error. *United States v. Kearn*, 863 F.3d 1299, 1305 (10th Cir. 2017). But he didn't. *United States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018).

[2]    In his reply brief, Mr. Sandoval denies foreseeability of the payments. Appellant's Reply Br. at 16. But he hasn't ever argued that the district court should have made a specific finding on foreseeability.

opening appellate brief. We thus conclude that the court didn't err in including the payments on behalf of the children.[3]

### d.    Medicare premiums

Finally, the district court included $10,694.70 in Medicare premiums that had been paid for Mr. Sandoval. He argues that the amount of these premiums shouldn't have been included in the loss. For the sake of argument, we may assume that Mr. Sandoval is right. Even with this assumption, the error would have been harmless.

For harmlessness, the government must show by a preponderance of the evidence that the error didn't affect Mr. Sandoval's substantial rights. *United States v. Harrison*, 743 F.3d 760, 764 (10th Cir. 2014). When we consider the possible effect on Mr. Sandoval's substantial rights, we focus on whether the error affected his sentence. *United States v. Kaufman*, 546 F.3d 1242, 1270 (10th Cir. 2008).

With this focus, we conclude that the error was harmless because the guideline range would stay the same. That range turned on the amount of the loss. *See* U.S.S.G. § 2B1.1(b)(1)(F) (2021 ed.). If the Medicare premiums ($10,694.70) had been deducted, the loss would have totaled

---

[3]    Mr. Sandoval suggests that one child might not have received $12,963 of the intended benefit. In support, he points out that the agency sent benefits for one child to a post office box. But Mr. Sandoval presented no evidence of a failure to receive payments for the child.

$172,404.40. That amount would have remained substantially above the threshold for a 10-level increase in the offense level ($150,000). *See id.*

When a miscalculation of the loss doesn't affect the offense level, the error is generally harmless. *United States v. Ary*, 518 F.3d 775, 790 (10th Cir. 2008); *see also United States v. Swanson*, 360 F.3d 1155, 1166–67 (10th Cir. 2004) (concluding that the use of the wrong version of the guidelines was harmless as to the calculation of the loss because the error wouldn't affect the offense level). Mr. Sandoval nonetheless suggests that the reduced loss probably affected the sentence because the district court had been "[o]n the precipice" of departing downward. Appellant's Reply Br. at 18. But the reduced loss wouldn't have put the loss amount near the threshold for a lower offense level. As a result, the possibility of a lower sentence would have been remote. *See United States v. Westerfield*, 714 F.3d 480, 488–89 (7th Cir. 2013) (concluding that an error exceeding $200,000 in the amount of the loss would be harmless because the offense level would remain the same and the possibility of an effect on the sentence would involve baseless conjecture).

**4.　Conclusion**

The evidence was sufficient to support the convictions, Mr. Sandoval doesn't show reversible error in the jury instructions, and any error in calculating the loss would have been harmless. So we affirm the convictions and the sentence.